[Crim. No. 15620. In Bank. Mar. 23, 1972.]

THE PEOPLE, Plaintiff and Respondent, v.
JAMES McINNIS, Defendant and Appellant.

**COUNSEL**

Edward J. Horowitz, under appointment by the Supreme Court, for Defendant and Appellant.

Evelle J. Younger and Thomas C. Lynch, Attorneys General, William E. James, Assistant Attorney General, and Geoffrey S. Cantrell, Deputy Attorney General, for Plaintiff and Respondent.

**OPINION**

**MOSK, J.**—Defendant was charged by information with robbery (Pen. Code, § 211), and pleaded not guilty. Following a hearing, defendant's motion to suppress certain evidence as the fruit of an illegal arrest (Pen. Code, § 1538.5) was granted in part and denied in part. A jury found defendant guilty of robbery in the first degree, and a motion for new trial was denied. He appeals from the judgment of conviction, seeking

to review the partial denial of his motion to suppress. We conclude the ruling on the motion was correct and the judgment should be affirmed.

The following facts are undisputed: At approximately 8:30 p.m. on October 28, 1968, a man entered a Pasadena liquor store and asked for two bottles of liquor. Jack Michel, the clerk, after reaching under the counter for a bag, straightened up to face a gun in the hand of the supposed customer. The man motioned Michel to the back of the store where the hands of the latter were bound behind his back and he was ordered to sit and face the wall. It is estimated that the victim saw the robber's face for approximately one minute.

The robber managed, with some difficulty, to open the cash register, and then departed. Two or three minutes later, Michel freed himself and immediately called the police. Missing were a radio kept near the cash register and $100 which had been in the till.

About this time Frederick Alford, a regular customer of the liquor store, drove into the nearby parking lot. As he left his car he saw a man coming around the front corner of the liquor shop, walking at a leisurely pace and holding an object which appeared to be the radio regularly kept in the store. Because he recognized the radio, Alford was curious and tried to "get a good look" at the man as they passed on the street. Alford saw him for a maximum of five seconds before crossing the street and proceeding to the liquor store to purchase a newspaper as was his nightly custom.

The police arrived about three minutes later. Both Michel and Alford described what they had seen, and Alford then returned to his place of employment. Shortly thereafter Michel was shown a stack of several hundred photographs, but could not find a picture of the robber among them. Forty-five minutes after the robbery a large collection of photographs was shown to Alford, who selected two photographs of men similar in appearance to the man he saw leaving the store.

One month later, Michel examined another group of old photographs and identified none of them. On November 29, a policeman brought five photographs for viewing by Michel who noticed that these appeared newer and larger than the earlier photos he had been shown, and he believed it significant that the police brought only a small number of pictures. He selected defendant's photograph out of the group. The date of November 25, 1968, was printed on the front of defendant's likeness, but Michel testified that he did not notice it at the time of his identification. One other photo in the group of five had a date on the front. When

shown the five photographs at the trial, Michel recalled defendant's and the other dated picture as among those which had been shown to him on November 29. He could not remember having seen the other three.

A few days after November 29, Alford was in the liquor store and was told by Michel that the district attorney was looking for him because the robber had been found. Alford drove to the police station where he was shown five photographs. He conceded that he expected to discover the robber's picture in the group because of his earlier conversation with Michel. Alford selected defendant's photograph; he was certain he had not noticed the date on it prior to his selection.

Michel identified defendant at the trial. He testified that the identification was based on his observations on the night of the robbery and on the photograph. Alford testified his identification of defendant at trial was based on having seen defendant on the night of the robbery, not on the photograph.

Defendant challenges the admissibility of the photograph as evidence, contending that it is fruit of an illegal arrest. He had been arrested on November 25, 1968, for violation of the Dangerous Weapons' Control Law (Pen. Code, § 12000 et seq.) after a cursory search revealed a .32 caliber automatic on his person. The photograph in issue was taken during the ensuing booking process. The court in the case at bar found the previous arrest to have been illegal and suppressed the gun, but refused to suppress the photograph, finding it was not "incriminating in itself." The People stipulated that for purposes of the section 1538.5 hearing the photograph "was a result of [an] illegal arrest."

Defendant contends that the use of the photograph to identify him was unlawful, and that the in-court identifications made by the witnesses were tainted by this use. The People maintain that exhibiting the picture to the witnesses and the testimony relating to the identification of the photograph by them were sufficiently remote and distinct from defendant's illegal arrest so as not to be tainted thereby.

In *Wong Sun* v. *United States* (1963) 371 U.S. 471, 487-488 [9 L.Ed. 2d 441, 455, 83 S.Ct. 407], the United States Supreme Court stated: "We need not hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' [Citation.]" The court indicated (at p. 487 [9 L.Ed.2d at p. 455])

that where "the connection between the lawless conduct of the police and the discovery of the challenged evidence" is so attenuated as to dissipate the taint, such evidence is admissible.

This court, in accord with the foregoing principle, decided *Lockridge* v. *Superior Court* (1970) 3 Cal.3d 166 [89 Cal.Rptr. 731, 474 P.2d 683]. In that case, also involving a robbery, witnesses against the defendants became available as the result of tracing serial numbers on an illegally seized gun. The trial court suppressed the admission of the gun but allowed the testimony of the witnesses. There was no evidence that without the lead supplied by the gun, the police investigation would have connected the defendants with the robbery. "Nevertheless," we stated, "we do not believe that the police connection of petitioners to the Pesce robbery through the illegal discovery of the gun is sufficient to characterize the Pesces' testimony as 'come at by exploitation of that illegality.'" (*Lockridge* v. *Superior Court* (1970) *supra,* 3 Cal.3d at p. 170.) The witnesses were already known to the police as the victims of an unsolved robbery, and the gun was found during the course of an investigation of totally unrelated crimes. We held it was "pure happenstance" that defendants were connected with the robbery.[1]

In the present case we are confronted with circumstances comparable to *Lockridge.* It is not disputed that the identification of a photograph of defendant originally taken as a result of an illegal arrest led to his connection with the current robbery. ██ As in *Lockridge,* however, the illegal arrest was in no way related to the crime with which defendant was ultimately charged. Indeed, two independent agencies were involved: the robbery was being investigated by Pasadena policemen, while Los Angeles authorities made the previous illegal arrest. The fact that a tenuous link was forged between the illegal arrest and the robbery is more clearly "pure happenstance" in the case at bar than in *Lockridge.*

The taking of a photograph during the booking process is standard police procedure (Pen. Code, § 7, subd. 21), bearing no relationship to the purpose or validity of the arrest or detention. Commonly known

---

[1]For cases in which we found evidence to be inadmissible because it was discovered by the exploitation of illegal police conduct, see *Lockridge* v. *Superior Court* (1970) *supra,* 3 Cal.3d at pp. 170-171. See also *Davis* v. *Mississippi* (1969) 394 U.S. 721 [22 L.Ed.2d 676, 89 S.Ct. 1394] (involving fingerprints) and *People* v. *Sesslin* (1968) 68 Cal.2d 418 [67 Cal.Rptr. 409, 439 P.2d 321] (involving handwriting exemplars), in which evidence discovered as a result of illegal police conduct was held to be inadmissible. In both cases, the illegal action of the police was part of the investigation of the very crime in which the evidence was discovered; clearly, the connection between the illegal conduct and the crime for which the defendant was prosecuted was not "pure happenstance."

as "mug shots," the photos are kept in permanent files regardless of the eventual disposition of the case; indeed, thousands of persons ultimately found to be entirely innocent undoubtedly have their photographs, as well as fingerprints, on record with law enforcement agencies. (See Newman, *Retention and Dissemination of Arrest Records: Judicial Response* (1971) 38 U.Chi.L.Rev. 850, 854; *Herschel* v. *Dyra* (7th Cir. 1966) 365 F.2d 17, 20, cert. den. 385 U.S. 973 [17 L.Ed.2d 436, 87 S.Ct. 513]; *Sterling* v. *City of Oakland* (1962) 208 Cal.App.2d 1 [24 Cal.Rptr. 696].)

To hold that all such pictures resulting from illegal arrests are inadmissible forever because they are "fruits of the poisonous tree" would not merely permit the criminal "to go free because the constable has blundered" (Cardozo, J., in *People* v. *Defore* (1926) 242 N.Y. 13, 21 [150 N.E. 585]) but would allow the criminal immunity because another constable in another jurisdiction in another case had blundered. It would in effect be giving a crime insurance policy in perpetuity to all persons once illegally arrested: if the photograph of a person obtained because of such an arrest becomes instrumental in the identification of that person for a crime committed many years later, it could be urged that *but for* the old illegal arrest the criminal would not have been identified. Rationally, however, a "but for" relationship alone is insufficient to render the photograph inadmissible since it cannot be said that many years later the illegality of the earlier arrest was being "exploited." ▮ As declared in *United States* v. *Edmons* (2d Cir. 1970) 432 F.2d 577, 584: "We are not obliged here to hold that when an arrest made in good faith turns out to have been illegal because of lack of probable cause, an identification resulting from the consequent custody must inevitably be excluded."

▮ In the case at bar, while the time span between the illegal arrest and the robbery was not one of years but only a month, nevertheless the principle remains the same, and there is no evidence whatever of exploitation. As indicated, countless mug shots were presented to the victim and the witness, some within minutes of the robbery. Indeed, the circumstances under which this particular photograph was exhibited were essentially fortuitous. That this defendant was not unknown to law enforcement authorities is indicated by his five prior arrests which are part of the record before us. It is to be assumed pictures were taken on each occasion. That the robbery victim and witness were shown defendant's more recent likeness, in preference to outdated photographs, suggests a reasonable police procedure rather than exploitation of an isolated arrest deemed improper. Modern and scientific investigation techniques are to

be encouraged. (*Simmons* v. *United States* (1968) 390 U.S. 377, 384 [19 L.Ed.2d 1247, 1253, 88 S.Ct. 967]; *People* v. *Graves* (1966) 64 Cal.2d 208, 211 [49 Cal.Rptr. 386, 411 P.2d 114].)

■ As a final contention, defendant argues that he was entitled to be represented by counsel when the photograph was shown to Michel and Alford. It is well settled that no such right exists. (*People* v. *Lawrence* (1971) 4 Cal.3d 273, 279-280 [93 Cal.Rptr. 204, 481 P.2d 212], and cases cited.)

The judgment is affirmed.

Wright, C.J., McComb, J., and Burke, J., concurred.

**TOBRINER, J.**—I dissent for reasons that were well expressed by Mr. Justice Peters in his dissenting opinion in *Lockridge* v. *Superior Court* (1970) 3 Cal.3d 166, at page 171 [89 Cal.Rptr. 731, 474 P.2d 683], an opinion in which I joined. We warned there that the court had forgotten "the long and bitter lesson of history which led to the adoption of the exclusionary rule in order to protect rights guaranteed by the Fourth and Fourteenth Amendments." (*Lockridge* v. *Superior Court, supra,* 3 Cal.3d at p. 172.) The majority decision, I believe, signifies a lapse of memory of those lessons which only further erodes the protection afforded *all* citizens against unconstitutional methods of law enforcement.

Almost 17 years ago, in *People* v. *Cahan* (1955) 44 Cal.2d 434 [282 P.2d 905, 50 A.L.R.2d 513], this court recognized that the exclusion from our courtrooms of evidence which was the product of illegal police activity was necessary, *not* to vindicate the rights of lawbreakers, nor to punish the constable who had blundered, but because such a rule was the only way to enforce the constitutional rights guaranteed to the people. By removing the profit from the use of illegally obtained evidence, we furnish an incentive for law enforcement officials to respect the rights of *all* citizens. By weakening this rule, by restoring *any* profit to illegal police activity, we threaten the liberty of our citizenry, and compromise the integrity of our courts. "[A]ny process of law that sanctions the imposition of penalties upon an individual through the use of the fruits of official lawlessness tends to the destruction of the whole system of restraints on the exercise of the public force that are inherent in the 'concept of ordered liberty.'" (*People* v. *Cahan, supra,* 44 Cal.2d at p. 446.)

That the conviction of defendant resulted directly from the use of the products of an illegal arrest is not, and cannot be disputed. But somehow the majority finds that this "primary taint" of illegality has been

attenuated, so as to remove the identification from the "fruit of the poisonous tree" prohibition. (*Wong Sun* v. *United States* (1963) 371 U.S. 471, at pp. 487-488 [9 L.Ed.2d 441, at p. 455, 83 S.Ct. 407].) Exactly where we are to find the "intervening independent act," which is required to break the causal chain between the illegality and the product of that illegality (*People* v. *Sesslin* (1968) 68 Cal.2d 418, at p. 428 [67 Cal. Rptr. 409, 439 P.2d 321]), lies in the foggy mists of the unknown. The identification of the defendant by the victims of the robbery was made possible *only* by exploiting the illegality of defendant's arrest—*not* " 'by means sufficiently distinguishable to be purged of the primary taint.' " (*Wong Sun* v. *United States, supra,* 371 U.S. at p. 488 [9 L.Ed.2d at p. 455].)

Indeed, the majority admit that the illegally seized photograph connected and linked defendant to the instant robbery. "It is not disputed that the identification of a photograph of defendant originally taken as a result of an illegal arrest led to his connection with the current robbery." "The fact that a tenuous link was forged between the illegal arrest and the robbery is more clearly 'pure happenstance' in the case at bar than in *Lockridge*." (*Ante,* p. 825.) How and where is the direct chain of causation between identification and illegal police action broken? Is the illegal conduct whitewashed by labelling the unlawful link "tenuous" or "happenstance"?

In this regard, the situation involved here is distinguishable from that in *Lockridge*. The holding in *Lockridge* was premised on the fact that while the illegally seized gun led to the connection of the defendant with the crime, the actual courtroom identification of the defendant was untainted by that illegality. The direct product of the illegal search in *Lockridge*—the gun—was excluded. Here by contrast, the direct product of the illegal police arrest—the booking photo—was not only admitted as evidence at trial, but as the testimony of the victims indicated, was the basis of their identification of the defendant. There was no showing that this taint of illegality had been in any way attenuated.

Thus the *Lockridge* doctrine has not only been affirmed by this decision, but has been further extended to situations which strike far closer to the heart of the exclusionary rule. The majority has taken an ominous and dangerous step away from the protections afforded by *Cahan* and *Mapp* v. *Ohio* (1961) 367 U.S. 643 [6 L.Ed.2d 1081, 81 S.Ct. 1684, 84 A.L.R. 2d 933].

Furthermore, the majority opinion can only serve to increase the hazards to innocent citizens which result from the retention and dissemination

of police arrest records. Despite the fact that an individual has been wrongfully arrested, or later acquitted or otherwise cleared of all charges, the record of that individual's arrest remains. While these records may often be declared "confidential," they are in fact widely disseminated and used almost without restriction both within the criminal justice system and without.[1] The harm from the retention and use of these records has been well documented: such records may subject the individual to adverse treatment by the police and the courts,[2] as well as to personal anguish, harm to the individual's reputation, and economic loss.[3]

The impact of this unjust use of such records will, in all likelihood, sharpen and widen in the future now that law enforcement officials stand to profit from illegal arrests. If these officials may use the direct fruits of illegal arrests in the prosecution of the individual for another offense, they will have a decided incentive to arrest anyone whom they "suspect" may be involved in illegal activity, regardless of whether that suspicion is legally sufficient for an arrest. If nothing else, the data collected in the

---

[1]For discussion of the wide dissemination of arrest records, and the resulting disabilities to the individual, see *T.N.G.* v. *Superior Court* (1971) 4 Cal.3d 767, 778-779 [94 Cal.Rptr. 813, 484 P.2d 981]; Note, *Retention and Dissemination of Arrest Records: Judicial Response* (1971) 38 U.Chi.L.Rev. 850; Note, *Discrimination on the Basis of Arrest Records* (1971) 56 Cornell L.Rev. 470, 472-473; Comment, *Criminal Records of Arrest and Conviction: Expungement from the General Public Access* (1967) 3 Cal.Western L.Rev. 121; Comment, *Guilt by Record* (1965) 1 Cal.Western L.Rev. 126; Baum, *Wiping Out a Criminal or Juvenile Record* (1965) 40 State Bar J. 816.

[2]For example, arrest records may be used by police in the decision of whether or not to arrest the individual at some future time, or whether to formally charge him, or by the court in considering O.R. release, setting bail, and in sentencing. (See, e.g., *Russell* v. *United States* (1968) 402 F.2d 185, 186 [131 App.D.C. 44]; *Rhodes* v. *United States* (4th Cir. 1960) 275 F.2d 78, 81-82; Note, *Retention and Dissemination of Arrest Records: Judicial Response* (1971) 38 U.Chi.L.Rev. 850, 855.)

[3]An individual with an arrest record is handicapped in obtaining insurance, credit, and especially in employment opportunities. For example, a study in New York City revealed that 75 percent of employment agencies would not refer an individual with an arrest record. (Note, *Retention and Dissemination of Arrest Records: Judicial Response* (1971) 38 U.Chi.L.Rev. 850, 864, fn. 79.) A number of surveys of employers have yielded similar results. (See, Committee to Investigate the Effects of Police Arrest Records on Unemployment in the District of Columbia, Report (1967); Schwartz & Skolnick. *Two Studies of Legal Stigma* (1962) 10 Social Prob. 133, 136; Comment, *Guilt by Record* (1965) 1 Cal.Western L.Rev. 126.) The burden of such a handicap is borne most heavily by those in our society who can least afford to bear it: since blacks are arrested substantially more frequently than whites on "suspicion arrests" which later prove unsupportable, this arrest record disability increases the difficulties many black citizens face in obtaining employment. (See *Gregory* v. *Litton Systems, Inc.* (C.D.Cal. 1970) 316 F.Supp. 401, 403; Note, *Discrimination on the Basis of Arrest Records* (1971) 56 Cornell L.Rev. 470, 472-473; Comment, *Arrest Records as a Racially Discriminatory Employment Criterion* (1970) 6 Harv.Civ. Rights-Civ.Lib.L.Rev. 165.)

illegal arrest may provide the police with a sufficient basis to convict the individual of another crime. More innocent citizens will now face illegal arrest, and with it, the resulting disabilities of a record.

I would reverse the judgment.

Peters, J., and Sullivan, J., concurred.

Appellant's petition for a rehearing was denied April 19, 1972. Peters, J., Tobriner, J., and Sullivan, J., were of the opinion that the petition should be granted.