10 Cal.3d 676 (1974)
517 P.2d 1145
111 Cal. Rptr. 681
In re MICHAEL V., a Person Coming Under the Juvenile Court Law.
JAMES D. CALLAHAN, as Chief Probation Officer, etc., Plaintiff and Respondent,
v.
MICHAEL V., Defendant and Appellant.
Docket No. S.F. 22978.
Supreme Court of California. In Bank.
January 21, 1974.
*679 COUNSEL
John D. Spyromilios, under appointment by the Supreme Court, for Defendant and Appellant.
Evelle J. Younger, Attorney General, Herbert L. Ashby, Chief Assistant Attorney General, William E. James, Assistant Attorney General, Eric Collins and William D. Stein, Deputy Attorneys General, for Plaintiff and Respondent.
OPINION
MOSK, J.
Michael V., a 17-year-old minor, appeals from an order of the juvenile court finding that he is a person described in section 602 of the Welfare and Institutions Code[1] and adjudging him a ward of the court (Welf. & Inst. Code, § 725, subd. (b)) by reason of his having violated section 11910 (now § 11377) of the Health and Safety Code (unlawful possession of restricted dangerous drugs). He challenges the above finding and his resultant commitment on the ground that the jurisdictional determination under section 602 was based on evidence obtained by an illegal search of his person. We conclude that this contention is without merit, and therefore affirm the order.
*680 On an evening in June 1971, two patrolling Alameda County sheriff's officers heard what sounded like a small caliber gunshot coming from the vicinity of a nearby shopping center and, fearing a robbery, drove into the parking lot at one end of the center. After scanning the stores in the area and finding nothing unusual, they observed four male youths sitting near a fence that enclosed the lot. From their car the officers asked the boys if they had heard a loud noise. The boys replied affirmatively and indicated the sound had come from the direction of another group about 25 yards away in the same lot. That group, they said, had just left.
The officers, noting that the fence surrounding the parking lot would prevent such a quick exit, decided to investigate the possibility that the four boys had themselves set off fireworks in violation of a county ordinance.[2] The officers stepped out of the patrol car and asked the boys to come over to the vehicle and empty their pockets. This communication took the following form: "Okay, boys, why don't you empty your pockets on the car?" Three of the youths began to comply, but appellant took flight. The officers apprehended him, informed him he was under arrest for "resisting" (Pen. Code, § 148), and searched him. They found a bottle of 28 secobarbital capsules, 9 firecrackers, and 2 books of matches.
Juvenile authorities filed a supplemental petition charging that appellant was a person described by section 602 of the Welfare and Institutions Code in that he violated section 11911 of the Health and Safety Code (possession for sale of a restricted dangerous drug). At the hearing, the secobarbital tablets found on appellant's person were introduced in evidence. The court found that appellant violated the provisions of section 11910 of the Health and Safety Code, a lesser and included offense, and entered the order above referred to. This appeal followed.
Preliminarily we observe that the juvenile court was required initially to consider and determine whether appellant was a person described by section 602 so as to establish its jurisdiction to adjudge him a ward of the court. (Welf. & Inst. Code, §§ 602, 701, 702.) "[F]or this purpose, any matter or information relevant and material to the circumstances or acts which are alleged to bring him within the jurisdiction of the juvenile court is admissible and may be received in evidence; however, proof beyond a reasonable doubt supported by evidence, legally admissible in the trial of criminal cases, must be adduced to support a finding that the minor is a person described by Section 602...." (Welf. & Inst. Code, § 701; *681 italics added.) In the instant case such jurisdiction rested on proof that appellant had violated the law by unlawfully possessing a restricted dangerous drug. If the evidence adduced to support this violation was not legally admissible, then the requisite jurisdictional finding, absent other competent evidence, cannot be upheld and the order of commitment based upon it must also fall.
We turn first to the issue of the lawfulness of the search. (1) The officers were entitled to detain and question appellant on circumstances constituting less than probable cause. (People v. Mickelson (1963) 59 Cal.2d 448 [30 Cal. Rptr. 18, 380 P.2d 658].) Probable cause was, however, a necessary prerequisite to an arrest or search. Until appellant's flight the officers possessed insufficient facts to establish probable cause. The officers had heard a noise, but its origin was impossible to identify with any certainty. They possessed no knowledge that would have directly linked the sound with appellant. The youths' story that the sound had come from another group which had exited the parking lot over the fence was not so implausible as to provide the additional quantum of suspicion necessary for probable cause.
At the time the officers requested appellant to empty his pockets, therefore, they were not entitled to conduct a search. If that request constituted the initiation of a search, then appellant's attempt to flee would not have justified the subsequent arrest and search. (2) First, it is no crime in this state to nonviolently resist the unlawful action of police officers. (Pen. Code, §§ 148 and 834; People v. Curtis (1969) 70 Cal.2d 347, 354-356 [74 Cal. Rptr. 713, 450 P.2d 33].) (3) Second, although flight combined with other facts may sometimes provide probable cause for arrest, where it is a direct response to unlawful police action it becomes "tainted" and cannot be so used. (Badillo v. Superior Court (1956) 46 Cal.2d 269, 273 [294 P.2d 23].)
If, on the other hand, the officers' actions are viewed as something other than the beginning of a search, as for example a permissible solicitation of consent to a search, appellant's flight provided ample cause for his arrest and the resulting search. Flight under such circumstances would, in light of the other facts known to the officers, provide probable cause to believe appellant had violated the county fireworks ordinance.
We are, therefore, called upon to characterize the conduct of the officers in requesting to see the contents of appellant's pockets. In making this determination we are guided by People v. Stout (1967) 66 Cal.2d 184 [57 Cal. Rptr. 152, 424 P.2d 704]. In that case a police officer investigated a *682 report that the defendants had engaged in suspicious behavior involving a blue overnight bag. The officer approached the driver's side of the defendants' automobile and saw the bag on the back seat of the passenger's side. After asking the defendants for information concerning the contents of the bag and receiving a noncommittal answer, the officer said, "Well, you wouldn't mind then if I take a look in the bag?" When the officer started to walk toward the passenger's side, the defendants drove off in a burst of speed. The officer gave chase and eventually apprehended them. His search of the bag revealed various items of contraband. We upheld the trial court's finding that the search was lawful, even though we found the officer lacked probable cause to search the bag at the time he requested to see its contents. We held that "Whether there was a threat of an illegal search capable of being carried out was a question of fact to be determined by the court in the light of all the circumstances." (Id. at p. 192.)
In Stout we distinguished Gascon v. Superior Court (1959) 169 Cal. App.2d 356 [337 P.2d 201], in which the detained person fled and attempted to throw away incriminating evidence after the officers announced they intended to conduct a search. We stated, "unlike Gascon where the officers announced their intentions to search the defendant, [the officer] in the instant case merely voiced a request to look in the bag. There was no response from the suspects. At that point he started walking toward the passenger's side of the car. Conceivably his request could have been met with a refusal upon his reaching his destination. At no time did he inform defendants that he was going to search the bag and we cannot say as a matter of law what was outwardly only a request, even when conjoined with his conduct, amounted to an announced intention to search." (66 Cal.2d at p. 192.)
We are of the opinion that the reasoning in Stout applies equally to the present case. The question "Okay, boys, why don't you empty your pockets on the car?" is no more indicative of an intent to pursue an unlawful search and is no more inherently coercive in impact than the question "Well, you wouldn't mind then if I take a look in the bag?" Indeed, the threat of a search appears to have been more imminent in Stout than in the present case, inasmuch as the officer in Stout coupled his communication with a movement in the direction of the object mentioned.
(4) Counsel for the state took the position in the juvenile court that the officers had merely asked the youths to consent to a search and had not announced or threatened an imminent nonconsensual search. The court did not expressly rule on this factual question, but its acceptance of the state's argument was implicit in its stated conclusion that the officers had *683 not exceeded the permissible scope of detention. Its determination of the implicit factual question finds substantial support in the record, and we are therefore bound by it. The evidence supporting the jurisdictional finding was thus lawfully obtained.
(5) Appellant's second contention is that the court erred in reading the probation report before making its jurisdictional determination. In In re Gladys R. (1970) 1 Cal.3d 855 [83 Cal. Rptr. 671, 464 P.2d 127], we held that Welfare and Institutions Code sections 701, 702, and 706 require that a juvenile court determine whether the facts of the case support the jurisdiction of the court before considering the social study prepared by the probation officer with respect to disposition of the juvenile. Our holding in Gladys R., however, does not apply to the present case. The record does not show that the judge read the social study before making or announcing his jurisdictional decision. The record shows that he read only the "jurisdictional facts" portion of the probation report. Probation reports are commonly divided into a jurisdictional fact section and a social study section. (Thompson, Cal. Juvenile Court Deskbook (Cont.Ed.Bar 1972) § 8.9, p. 74.) The jurisdictional facts, unlike the social study, obviously contain "information relevant and material to the circumstances or acts which are alleged to bring [the minor] within the jurisdiction of the juvenile court." Thus this portion of the report was admissible under Welfare and Institutions Code section 701.
(6) Appellant's contention that the court's use of the probation report denied him the right to confrontation of witnesses against him is likewise without merit. The judge stated that he found the report of the account appellant had told the probation officer inconsistent with the story to which he had testified in the juvenile proceedings. It appears this comparison was at best an insignificant factor in the court's determination of jurisdiction or disposition. But even if it be assumed arguendo that the report of appellant's statement had substantially influenced the court, there would be no denial of the right to confrontation. Although the probation officer did not testify, he was present at the hearing and could have been subjected to cross-examination regarding the assertions in his report. Counsel for appellant, however, made no effort to do so. Furthermore, the United States Supreme Court has held in California v. Green (1970) 399 U.S. 149 [26 L.Ed.2d 489, 90 S.Ct. 1930], that the right to confrontation is not violated by the admission of a declarant's prior out-of-court statements where the declarant testifies at trial and is subject to questioning regarding the prior statements.
(7) Appellant's final contention is that the judgment must be reversed *684 because the court's reliance on the written report of one of the arresting officers, who did not appear at the juvenile proceeding, denied him the right to confrontation. This argument must also fail. First, it clearly appears the court would have reached the same result had it not considered this report. The other arresting officer did testify at the proceeding, and his testimony alone would have been sufficient to support a judgment bringing appellant within the jurisdiction of the juvenile court. The only important conflict between the testimony of that officer and that of appellant and witnesses on his behalf concerned the location in which the unlawful drug was discovered by the officers. According to appellant's account, the contraband was found in the pocket of the jacket he was wearing; according to the testifying officer, it was discovered in his pants pocket. The written report corroborated the testimony of the officer. But even if appellant were correct and the drug had been found in the jacket, to reach a different judgment the court would have had to accept appellant's implausible story that the jacket was not his and he had found it in the parking lot immediately before the police arrived. Since we cannot believe the court would have accepted this story, its consideration of the police report appears unnecessary to its decision. Appellant, therefore, suffered no reversible error.
Second, the police report was introduced into evidence not by counsel for the state but by counsel for appellant. In an adult criminal proceeding, the introduction of such evidence by a defendant would bar him from later asserting error stemming from reliance on it. (Evid. Code, § 353.) Appellant contends that a different rule is established for juvenile proceedings by section 701 of the Welfare and Institutions Code. That section renders admissible in the jurisdictional portion of a juvenile proceeding "any matter or information relevant and material to the circumstances or acts which are alleged to bring him within the jurisdiction of the juvenile court." Thus incompetent evidence, such as hearsay, may be received in evidence. The same section provides, however, that "proof beyond a reasonable doubt supported by evidence, legally admissible in the trial of criminal cases, must be adduced to support a finding that the minor is a person described by section 602." Appellant contends the statutory requirement that a jurisdictional finding of the juvenile court be predicated on proof beyond a reasonable doubt supported by legally admissible evidence places a duty upon the court to exclude from consideration, on its own motion, any inadmissible evidence.
(8) The unique provision in section 701, allowing incompetent evidence to be admitted but preventing it from being used to support a judgment, was apparently designed to preserve the informality of the juvenile court proceeding by eliminating the necessity of objecting to the introduction of incompetent evidence. (9) Thus, when the state introduces incompetent *685 evidence, the juvenile court does have a duty to exclude consideration of it as a ground for its jurisdictional judgment, and it must do this on its own motion. Section 701, however, does not alter the doctrine of invited error. When a minor introduces incompetent evidence, in order to avoid estoppel on the basis of invited error he must specify any portions of that evidence he does not desire to be used in support of the judgment. Thus, when the minor introduces an out-of-court statement without seeking to limit its use or to bring the declarant into court for examination, he is estopped to assert that reliance on such evidence by the juvenile court denies him any right of confrontation.
The judgment is affirmed.
McComb, J., Burke, J., and Draper, J.,[*] concurred.
SULLIVAN, J.
I dissent. I cannot agree that the evidence relied upon to establish the jurisdiction of the juvenile court over appellant was lawfully obtained. On the contrary, the record before us clearly shows that appellant was the subject of an illegal search at the hands of the sheriff's officers and that the evidence thereby seized  a bottle of secobarbital pills  should have been excluded as the fruit of such search.
Preliminarily I point out a few facts in addition to those set forth in the majority opinion. When in response to the summoning of the officers the boys approached the patrol car, the officers declared "Okay, boys, why don't you empty your pockets on the car?" in an effort to "see if they had any contraband or fireworks." Three of the youths began to comply, but appellant took flight. Pursued by one of the officers, he leaped over the fence. As he landed on the other side, the officer seized his arm. Appellant wrenched himself free but was soon caught, subdued, and handcuffed. The officers hauled appellant back across the fence, informed him that he was under arrest for "resisting" (Pen. Code, § 148), and searched him. They found in his pocket a bottle of 28 secobarbital capsules, 9 firecrackers, and 2 books of matches.
The majority maintain that the officers' statement was not the beginning of a search but merely a request that the boys reveal the contents of their pockets voluntarily. Thus they conclude that it is not necessary to reach the issue of whether there was an illegal search. I am of the view that the policeman's statement did signal the initiation of a search and that therefore the question of the legality of the search must be answered. As will appear, I have concluded that the search was illegal and its fruits should not have been admitted against appellant in this proceeding.
*686 I first consider whether, in the circumstances of this case, the words uttered by the officer immediately preceding appellant's flight amounted to the exercise of official authority to search or, on the other hand, whether they constituted only a permissible solicitation of consent to a search.
In Bumper v. North Carolina (1968) 391 U.S. 543 [20 L.Ed.2d 797, 88 S.Ct. 1788] police officers gained admittance to a residence when one of them announced that "I have a search warrant to search your house." (Id. at p. 546 [20 L.Ed.2d at p. 801].) The prosecutor did not rely upon a warrant to justify the search, however, but upon the consent of the resident. The court, in holding the search to be unlawful, stated: "When a law enforcement officer claims authority to search a home under a warrant, he announces in effect that the occupant has no right to resist the search. The situation is instinct with coercion  albeit colorably lawful coercion. Where there is coercion there cannot be consent." (Id. at p. 550 [20 L.Ed.2d at p. 803].) (See also Parrish v. Civil Service Commission (1967) 66 Cal.2d 260, 268-269 [57 Cal. Rptr. 623, 425 P.2d 223];[1]Lane v. Superior Court (1969) 271 Cal. App.2d 821, 825 [76 Cal. Rptr. 895].)
Here, to be sure, there was no consent on appellant's part. However, in determining whether police have made an illegal demand for a search the question of compliance is of little moment. The cases involving "consensual" searches are relevant here in that they indicate under what circumstances a police officer's statement must be characterized as an order rather than a request, regardless of whether or not there was ultimate compliance.
The situation in the instant case is similar to that which was found "instinct with coercion" in Bumper even though no threats of official sanction were actually voiced. Here, two uniformed officers, after making inquiries about the sound they had heard, directed the four juveniles to empty the contents of their pockets on the hood of the marked patrol car. This "request," accompanied by the officers' implied assertion of authority, was in my view clearly an order rather than merely a solicitation of consent. This order was the beginning of a search, not a request for an intentional and knowing waiver of a constitutional right. (Cf. Johnson v. United States (1948) 333 U.S. 10, 13 [92 L.Ed. 436, 439-440, 68 S.Ct. 367].)
*687 The majority rely on People v. Stout (1967) 66 Cal.2d 184 [57 Cal. Rptr. 152, 424 P.2d 704] in making their determination that the officers were simply asking, and not telling the boys to empty their pockets.[2] There, the defendant had been seen carrying a blue overnight bag and running toward a construction site, where he hid the bag. A car then drove up, defendant recovered the bag and entered the car. Immediately thereafter the police arrived and began to question the suspects; one officer asked "`Well, you wouldn't mind then if I take a look in the bag?'" (Id. at p. 188.) As the officer started around to the other side of the car, defendant sped away. At trial the officer was examined on voir dire; he stated that he merely intended to go to the other side of the car to continue the conversation and to ask permission to look in the bag
We deemed the officer's statement in Stout to be "outwardly only a request" (Stout, supra, at p. 192) to which, presumably, the persons in the car could have answered "Yes, we do mind." I do not believe, however, that the same could be said for the statement in this case. The shortcoming in the majority's reasoning lies in the fact that they fail to appreciate that the issue here is one of coercion, not of punctuation. After preliminary questioning the officer said: "Okay, boys, why don't you empty your pockets on the car?" The mere fact that the officer's statement was interrogative in form is of little import. The substance and impact of the statement and the situation in which it was made should be controlling in our determination. In fact, there is testimony indicating appellant's impression that the police had "told" him to empty his pockets.[3] In light of the facts and circumstances in this case, only a strained and very technical interpretation of the officer's words could result in a conclusion that this was other than an authoritative demand.
Having determined that the officer's statement comprised the beginning *688 of a search, I now turn to consider whether the search was legal. "In the absence of evidence to the contrary, it is presumed that the officers acted legally.... When, however, the question of the legality of an arrest or of a search and seizure is raised ... at the trial, the defendant makes a prima facie case when he establishes that an arrest was made without a warrant or that private premises were entered or a search made without a search warrant, and the burden then rests on the prosecution to show proper justification. [Citations.]" (Badillo v. Superior Court (1956) 46 Cal.2d 269, 272 [294 P.2d 23]; see also Abt v. Superior Court (1969) 1 Cal.3d 418, 420 [82 Cal. Rptr. 481, 462 P.2d 10].) The record before us clearly shows that the search in dispute was neither pursuant to a warrant nor incident to an arrest made in obedience to a warrant. Indeed, the Attorney General argues that the search was justified on either of the following bases:[4] First, it was incidential to a lawful arrest made without a warrant on reasonable cause to believe that appellant had committed a public offense in the presence of the officers. The gist of this argument is that the officers had reasonable cause to believe that appellant discharged or possessed firecrackers in the officers' presence. Second, assuming arguendo that at the time they requested appellant and his companions to empty their pockets the officers did not have reasonable cause to arrest appellant, nevertheless they at least had sufficient cause to "stop and frisk" him.
Examining the first argument in support of the search, I advert briefly to the familiar governing rules. As we recently observed in People v. Superior Court (1970) 3 Cal.3d 807, 812-813 [91 Cal. Rptr. 729, 478 P.2d 449, 45 A.L.R.3d 559], "It is now settled that as an incident to a lawful arrest, a warrantless search limited both as to time [citation] and place [citation] may be made (1) for instrumentalities used to commit the crime, the fruits of that crime, and other evidence thereof which will aid in the apprehension or conviction of the criminal; (2) for articles the possession of which is itself unlawful, such as contraband or goods known to be stolen; and (3) for weapons which can be used to assault the arresting officer or to effect an escape. [Citation.]" A peace officer may without a warrant arrest a person whenever he has reasonable cause to believe that the person to be arrested has committed a public offense in his presence. (Pen. Code, § 836, subd. 1; Freeman v. Dept. Motor Vehicles (1969) 70 Cal.2d 235, 237 [74 Cal. Rptr. 259, 449 P.2d 195]; see also People v. *689 Privett (1961) 55 Cal.2d 698, 701 [12 Cal. Rptr. 874, 361 P.2d 602]; People v. Simon (1955) 45 Cal.2d 645, 648 [290 P.2d 531].) An offense is committed in the "presence" of the officer if it is apparent to him through the use of any of his senses (People v. Brown (1955) 45 Cal.2d 640, 642 [290 P.2d 528]; Sarafini v. City & County of San Francisco (1956) 143 Cal. App.2d 570, 577 [300 P.2d 44]). We have said that "Reasonable or probable cause for an arrest has been the subject of much judicial scrutiny and decision. There is no exact formula for the determination of reasonableness. Each case must be decided on its own facts and circumstances [citations]  and on the total atmosphere of the case. [Citations.] Reasonable cause has been generally defined to be such a state of facts as would lead a man of ordinary care and prudence to believe and conscientiously entertain an honest and strong suspicion that the person is guilty of a crime. [Citations.]" (People v. Ingle (1960) 53 Cal.2d 407, 412-413 [2 Cal. Rptr. 14, 348 P.2d 577].) The facts and circumstances leading to this determination must be limited to those that are known to the officer at the time the arrest or search is made. (People v. Talley (1967) 65 Cal.2d 830, 835 [56 Cal. Rptr. 492, 423 P.2d 564].)
Applying these principles to the case at bench, I note that before the officers ordered the youths to empty their pockets,[5] they heard coming from the direction of the shopping center what sounded like a firecracker or a small caliber gun. After driving through the center's parking lots the officers came upon the group of four youths, who in response to the officers' inquiries stated that they too had heard the noise. The boys informed the officers that the sound came from another group of individuals 25 yards away, but that the other group had left. The record discloses nothing suspicious or furtive in the conduct of the boys, nor any other facts which would give an ordinarily prudent person reasonable cause to believe that any of the boys had committed a public offense. One officer testified that he nevertheless decided to search the boys because "the sound came from the vicinity of the boys and ... there was nobody else in that vicinity ... which is enclosed by a fence and ... the only exit of these individuals at this time would be over a section that would be a backyard."
I find these facts, and the officer's last-quoted explanation insufficient to establish reasonable cause to believe that any of these boys had committed a public offense. When initially questioned about the sound, the youths gave a comprehensible explanation that on its face was not misleading *690 (contrast People v. Lyles (1968) 260 Cal. App.2d 62, 65 [66 Cal. Rptr. 799]) nor inherently implausible (contrast People v. Sandoval (1966) 65 Cal.2d 303, 310 [54 Cal. Rptr. 123, 419 P.2d 187]). Nor was the group's mere presence in the vicinity of a recent public offense sufficient, without more corroborating evidence than was shown here, to justify an honest and strong suspicion that they had committed the offense. (Contrast People v. Duncan (1959) 51 Cal.2d 523, 526-528 [334 P.2d 858].) The officer who testified at the hearing seems to have relied heavily on the fact that the parking lot was enclosed by a fence, making the exit by another group difficult. Yet appellant jumped the same fence in his attempt to escape, and it is reasonable to assume that the other group may have done the same, or may have exited through the shopping center.
In sum, although the boys' conduct was completely consistent with lawful activity, the Attorney General urges us to hold that there was reasonable cause to arrest appellant because he happened to be with a group of boys in a parking lot in which a single firecracker may have been discharged. I fail to see how this state of facts would lead a man of ordinary care to conscientiously entertain an honest and strong suspicion that appellant had committed a public offense in the presence of the officers. Indeed, contrary to the position now taken before us by the Attorney General, the record clearly shows that the sheriff's officers had no intention to arrest the four boys at the time of their initial confrontation but that they were merely detaining the boys for the purpose of questioning. (People v. Mickelson (1963) 59 Cal.2d 448, 450 [30 Cal. Rptr. 18, 380 P.2d 658].)[6] We conclude that the attempted search stemming from the officers' direction *691 that the boys empty their pockets cannot be justified as a search incidental to a lawful arrest.
I, therefore, turn to consider the second argument advanced by the Attorney General to uphold the search. The argument runs as follows: The officers had at least sufficient cause to "stop and frisk" appellant; during the course of the officers' "investigation," appellant broke and ran; while fleeing, appellant struck the pursuing officer; as a consequence appellant was lawfully arrested for resisting an officer; therefore, the officers had a right to search his pockets.
It is clear that the officers were acting within constitutional limits in questioning the juveniles. (People v. Mickelson, supra, 59 Cal.2d 448, 450.) However, when they ordered the boys to empty out their pockets on the patrol car, they exceeded the constitutional limits of a proper search incident to an investigatory "stop" or detention. These narrow and clearly defined limits permit "a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime." (Terry v. Ohio (1968) 392 U.S. 1, 27 [20 L.Ed.2d 889, 909, 88 S.Ct. 1868]; italics added.) (See also People v. Collins (1970) 1 Cal.3d 658, 661-662 [83 Cal. Rptr. 179, 463 P.2d 403].) Such a search "must therefore be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." (Id. at p. 29 [20 L.Ed.2d at p. 911].) Conversely, it is unlawful for a police officer to search the clothes of a subject during an investigation when the motivation for the search is the discovery of evidence and the circumstances do not warrant the belief that the safety of the officer or others is in jeopardy. (Sibron v. New York (1968) 392 U.S. 40, 64-65 [20 L.Ed.2d 917, 935-936, 88 S.Ct. 1889]; Cunha v. Superior Court (1970) 2 Cal.3d 352, 356 [85 Cal. Rptr. 160, 466 P.2d 704]; People v. Collins, supra, 1 Cal.3d at pp. 662-633; Irwin v. Superior Court (1969) 1 Cal.3d 423, 428 [82 Cal. Rptr. 484, 462 P.2d 12].)
The search in this case cannot be justified as a self-protective search for weapons under the holding of Terry v. Ohio, supra, 392 U.S. 1. The facts do not reveal cause for apprehension by the officers for their safety. Rather than pat search the four youths, the officers ordered them to empty their *692 pockets on the car. Clearly, an officer does not protect himself by ordering a suspect to pull out any weapons that he may be carrying. Furthermore, one of the officers testified that the search was motivated not by self-protection but by a desire to "see if [the boys] had any contraband or fireworks." Such a motivation is impermissible (Sibron v. New York, supra, 392 U.S. at p. 65 [20 L.Ed.2d at p. 936]).[7] The limited self-protective power to make a superficial search for weapons in the course of an on-the-street investigative detention will not be allowed to erode fundamental Fourth Amendment requirements for probable cause or, absent exigent circumstances, a warrant prior to a search.
Calling on a suspect to put his hands into his own pockets and reveal their contents is, in my view, indistinguishable in intrusive effect from the placement of the officer's own hand in the suspect's pockets and amounts to the unreasonable intrusion denounced by the United States Supreme Court in Sibron. I conclude, therefore, that the initial command that appellant empty his pockets constituted an unlawful search of his person.
I turn now to the question whether the evidence seized  the bottle of secobarbital pills  should have been excluded as the fruit or direct result of the illegal search.[8]
*693 In Wong Sun v. United States (1963) 371 U.S. 471, 487-488 [9 L.Ed.2d 441, 455-456, 83 S.Ct. 407], the Supreme Court set forth the following test, applicable to the states, for determining whether evidence obtained after an illegal search is to be excluded: "We need not hold that all evidence is `fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is `whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." (Italics added.)
Appellant argues that his flight, his subsequent arrest for resisting an officer, and the ensuing discovery of the secobarbital in his pockets proceeded directly from the initial illegal search, and that the bottle of pills "has been come at by exploitation of that illegality." A similar factual situation is found in Badillo v. Superior Court, supra, 46 Cal.2d 269. There, police illegally entered the defendant's house to search for narcotics. Defendant ran out the front door and threw a package of heroin on the ground. In holding this evidence to be inadmissible, we stated a rule that, although preceding the rule of Wong Sun, coincides with the holding of that case: "It clearly appears ... that defendant's flight out the front door and attempted disposal of the evidence was the direct result of Officer Getchell's illegal entry, and accordingly, the evidence was obtained in violation of constitutional guarantees. [Citations.]" (Id. at p. 273; italics added.)
In the case at bench, appellant's flight from the officers, his arrest and search, and the discovery of the pills were likewise "direct results" of the initial illegal search. These events immediately followed the illegal search. Appellant's reaction  jumping the fence and wrenching himself from the officer's grasp  may have been a rash one, but it was nevertheless the direct and understandable result of the officers' illegal command to empty his pockets. The fact that several events transpired  albeit in rapid sequence  before the incriminating evidence was eventually found does not defeat the inference that the evidence was "come at by the exploitation" of the illegal search.[9]
*694 Nor is this a case where the authorities learned of the evidence "from an independent source" (Silverthorne Lumber Co. v. United States (1920) 251 U.S. 385, 392 [64 L.Ed. 319, 321, 40 S.Ct. 182, 24 A.L.R. 1426]) or where the link between the illegal search and the subsequent discovery of evidence has "`become so attenuated as to dissipate the taint' [of illegality]." (Wong Sun v. United States, supra, 371 U.S. at p. 487 [9 L.Ed.2d at p. 455], quoting Nardone v. United States (1939) 308 U.S. 338, 341 [84 L.Ed. 307, 311, 60 S.Ct. 266]; see also People v. McInnis (1972) 6 Cal.3d 821, 825 [100 Cal. Rptr. 618, 494 P.2d 690]; Lockridge v. Superior Court (1970) 3 Cal.3d 166, 170 [89 Cal. Rptr. 731, 474 P.2d 683].)[10]
I arrive at these final conclusions: That the officers' direction that appellant empty his pockets constituted an attempt to conduct an unlawful search of his person; that appellant's ensuing flight, resistance, capture, arrest and search were the direct result of this initial illegality; that the restricted dangerous drugs seized by the officers in the course of the final arrest and search were the fruit of such primary illegality and were, therefore, not admissible in evidence at the hearing; and that absent other sufficient evidence, there is no substantial evidence to support the finding that appellant violated section 11910 of the Health and Safety Code and was, because of such violation, a person described in section 602 of the Welfare and Institutions Code.
Accordingly, I would reverse the order appealed from.
Wright, C.J., and Tobriner, J., concurred.
Appellant's petition for a rehearing was denied February 20, 1974. Wright, C.J., Tobriner, J., and Sullivan, J., were of the opinion that the petition should be granted.
NOTES
[1] Section 602 then provided: "Any person under the age of 18 years who violates any law of this state or of the United States or any ordinance of any city or county of this state defining crime or who, after having been found by the juvenile court to be a person described by Section 601, fails to obey any lawful order of the juvenile court, is within the jurisdiction of the juvenile court, which may adjudge such person to be a ward of the court."
[2] Alameda County Ordinance No. 3-22.0 makes it a misdemeanor to discharge fireworks in unincorporated areas of the county.
[*] Assigned by the Chairman of the Judicial Council.
[1] In Parrish we said: "With increasing frequency the courts have denied the efficacy of any consent to a search obtained by covert threats of official sanction or by implied assertions of superior authority. The courts have been quick to note the disparity of position between a government agent and an ordinary citizen; they have taken cognizance of the threat of unspecified reprisals which inheres in the official request for admission. [Citations.]"
[2] The majority, in reaching this conclusion, applied the substantial evidence rule, following language found in Stout which stated: "Whether there was a threat of an illegal search capable of being carried out was a question of fact to be determined by the court in the light of all the circumstances." (66 Cal.2d at p. 192.) In Stout, however, it was clear as a matter of law that the request there involved was not tantamount to a demand and therefore did not signal the initiation of an illegal search. Moreover, cases decided after Stout have established that the lawfulness of a search is to be determined as a matter of law when the facts and circumstances are not in dispute. (See, e.g., People v. Bradford (1972) 28 Cal. App.3d 695, 700 [104 Cal. Rptr. 852]; People v. Superior Court (1970) 3 Cal. App.3d 476, 488 [83 Cal. Rptr. 771].)
[3] "Q. [Counsel for appellant]: Did you put your hands in your pockets when the police were detaining you and the three other boys?

"A. [Appellant]: Yes I did. When they told us to  they walked up to me and they asked me if  what I had in my pockets and then they said empty everything out of my pockets and put it on the car." (Italics added.)
[4] As noted above, the majority does not consider either of the grounds offered by the Attorney General in support of the search because they conclude that there was no search in progress at the time when appellant fell. It should further be noted that this theory was not set forth in the brief of the People and was raised for the first time at oral argument.
[5] If probable cause to arrest existed at this point, then the search would be proper, even though it preceded a formal arrest. (People v. Simon, supra, 45 Cal.2d at p. 648.)
[6] At the hearing, the arresting officer testified:

"[Counsel for the minor]: Were you detaining the boys at that time?
"[Arresting officer]: Yes, sir.
".... .... .... .... .... . .
"Q. Would you say that the boys were actually being restrained at that time?
"A. What do you mean by restrained?
"Q. Is that what you mean by detention, by detaining?
"A. No. A detention is when we're investigating if in fact a crime had taken place, getting information.
"Q. What does the word `restrained' mean to you?
"A. Restrained means restraining a man where he does not have freedom of his limbs.
"Q. What does the word `detain' mean to you?
"A. Detained means detained for a small period of time, to investigate.
".... .... .... .... .... . .
"Q. When the boys came over to the car to empty their pockets on the hood, would you say that they had submitted to your custody?
"A. Yes, sir.
"Q. In other words, you considered them to be in your custody at that moment?
"A. In custody?
"Q. In your custody. I believe you just stated that you felt when they came over to the car to empty their pockets on the hood that they had submitted to your custody.
"A. They were detained by us. They were in detention."
[7] In Sibron, the officer, after stating "You know what I am after," thrust his hands into defendant's pocket. The court stated: "Even assuming arguendo that there were adequate grounds to search Sibron for weapons, the nature and scope of the search conducted by Patrolman Martin were so clearly unrelated to that justification as to render the heroin inadmissible. The search for weapons approved in Terry consisted solely of a limited patting of the outer clothing of the suspect for concealed objects which might be used as instruments of assault. Only when he discovered such objects did the officer in Terry place his hands in the pockets of the men he searched. In this case, with no attempt at an initial limited exploration for arms, Patrolman Martin thrust his hand into Sibron's pocket and took from him envelopes of heroin. His testimony shows that he was looking for narcotics, and he found them. The search was not reasonably limited in scope to the accomplishment of the only goal which might conceivably have justified its inception  the protection of the officer by disarming a potentially dangerous man. Such a search violates the guarantee of the Fourth Amendment, which protects the sanctity of the person against unreasonable intrusions on the part of all government agents." (Id. at pp. 65-66 [20 L.Ed.2d at p. 936]; italics added.)
[8] Appellant's argument that his eventual arrest for resisting an officer and the ensuing search of his person are unlawful in any event is without merit. Quite apart from the initial attempt of the officers to have him empty his pockets, it becomes apparent that, once appellant fled, jumped the fence, and wrenched himself free from the pursuing officer, he was subject to arrest for resisting an officer (Pen. Code, § 148; see In re Joe R. (1970) 12 Cal. App.3d 80, 85-86 [90 Cal. Rptr. 530]) and could be searched incident to that arrest. It is also possible that, given the facts previously known to the officers and the corroborating suspicions aroused by appellant's flight, there may have been reasonable cause to arrest appellant for violation of the county ordinance against firecrackers.
[9] See, for example, People v. Haven (1963) 59 Cal.2d 713 [31 Cal. Rptr. 47, 381 P.2d 927], where police unlawfully entered defendant's home. In their search, they uncovered a hotel key, went to the hotel, and ultimately found narcotics in the hotel room. In holding the evidence to be inadmissible, we stated: "the consent, the search, the finding of the key, and the resulting discovery of the marijuana in the hotel room were all products of the officers' unlawful entry and cannot be relied upon to sustain the judgment." (Id. at p. 718, citing Wong Sun v. United States, supra, 371 U.S. 471.)
[10] In McInnis and Lockridge we held admissible evidence that would not have been obtained but for illegal police activity. However, in both cases the challenged evidence had been obtained by "pure happenstance" when routine police procedures (the taking of a mug shot in McInnis; checking the serial number of a gun in Lockridge) linked the defendants with their crimes and resulted in independent identification by witnesses. This was simply an application of the Wong Sun test. In the instant case, it was not "pure happenstance" that an unlawful command to disclose the contents of appellant's pockets would finally culminate in the uncovering of the contraband. Nor can it be said that appellant's capture and arrest for resisting the officers constituted merely routine police procedures which were so independent from or tenuously connected with the initial illegal action of the officers as to be upheld under McInnis and Lockridge.