STATE OF NEBRASKA, APPELLEE, V. GREGORY B. TYRRELL,
APPELLANT.

453 N.W.2d 104

Filed March 30, 1990.    No. 89-366.

Kristi J. Egger, Deputy Hall County Public Defender, for appellant.

Robert M. Spire, Attorney General, Jill Gradwohl Schroeder, and, on brief, Steven J. Moeller for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

CAPORALE, J.

Pursuant to verdicts, defendant-appellant, Gregory B. Tyrrell, was adjudged guilty of first degree sexual assault, in violation of Neb. Rev. Stat. § 28-319(1)(a) (Reissue 1989), and burglary, in violation of Neb. Rev. Stat. § 28-507 (Reissue 1989). He was thereafter found not to be a mentally disordered sex offender and sentenced to imprisonment for consecutive terms of not less than 16 years 8 months nor more than 50 years for the sexual assault and not less than 6 years 8 months nor more than 20 years for the burglary. Tyrrell asserts the district court erred by (1) receiving the victim's out-of-court identification of him as her assailant, (2) receiving the victim's in-court identification of him as her assailant, (3) finding the evidence sufficient to sustain his conviction of burglary, (4) considering in its sentence determinations the suppressed out-of-court statements which Tyrrell had made to police, (5) imposing consecutive rather than concurrent sentences, and (6) otherwise imposing excessive sentences. The record sustaining none of those assigned errors, we affirm.

The victim spent the evening of Monday, September 21, 1987, alone in her Grand Island, Nebraska, apartment ironing and watching television before retiring to bed. Shortly before 3 a.m. on September 22, she awoke to the sound of rustling jeans and footsteps coming down her apartment hallway. She also saw the light from a flashlight moving down the hallway toward the bedroom where she had been sleeping. A male figure then appeared in her bedroom doorway.

The intruder shined his small, yellow pocket flashlight into the victim's eyes, whereupon she arose and moved to the foot of

her bed. She there struggled with the intruder momentarily, and the intruder, who was wearing gloves, struck the victim's face. As a result, the victim fell back on the bed, at which time the intruder got on top of her and held her down. When the victim continued to scream and fight, the intruder told her he had a gun and to shut up. Fearing that her assailant might kill her, the victim stopped screaming and struggling, and began to closely observe the intruder as he sat on top of her.

The victim testified that as part of her training as a supervisor of a chain of convenience stores, she had been taught how to react in the event of a robbery. She testified that she had also been involved in teaching such procedures and that such training teaches persons to be particularly observant of the details of a robbery and of the description of individuals perpetrating such a crime. The victim testified that she was cognizant of this training in observing the intruder as he sat on top of her on the bed.

She also testified that she has 20/20 vision but wears a single contact lens in her right eye to correct a "slight astigmatism." While she testified that she was not wearing the lens when she was assaulted, she also testified that the lens is "mainly for the prevention of headaches" and that she has no trouble seeing without it. The victim's testimony further indicated that an electric light shining through the curtain of a large bedroom window, along with the light from her assailant's flashlight, which was shining the "entire time" he was in the bedroom, provided enough light for her to observe her assailant.

While still holding her down on the bed, the assailant removed the victim's panties, the only article of clothing she was wearing at the time. Using his left hand, from which he had removed the glove, the assailant repeatedly penetrated the victim's vagina. During most of this time, the assailant kept the flashlight in his right hand and also used the right hand to hold the victim down on the bed, "[s]o the light was shining up sometimes even into his face." At times, the assailant shined the flashlight on the victim's body. The victim testified that she had a "clear vision" of her assailant's face while she was being assaulted, and specifically described the clothing which he was wearing.

After 5 to 10 minutes, the assailant stood up and ordered the victim to turn over and lie on her stomach. The victim complied, noticing by looking at her clock radio that it was exactly 3 a.m. As she lay on her stomach, she observed her assailant as he "was fumbling with the buttons trying to unfasten his pants." The victim "could see him very clearly" and "could see that he didn't have a gun in any pockets or stuffed in his jeans," so she decided to fight. She thus stood up, moved to the foot of the bed, and placed one foot on the floor and the other knee on the bed. The assailant then approached her and "stood there with his hands on [her] shoulders for a few seconds and then [she] kicked him between the legs." The assailant took about three steps back, groaned, looked at the victim, looked at the door, looked back at the victim, and ran out the bedroom door.

With the victim "screaming at the top of [her] lungs" and following him, the assailant ran out of the apartment while attempting to fasten his trousers. The victim had locked the deadbolt lock on her apartment door before retiring, but observed that her assailant "had obviously unlocked the doors before he came into [her] bedroom because all he did was reach out and pull on the knob" when he exited the apartment. The victim continued to pursue her assailant within the well-lighted common area inside the apartment building, at one point meeting him face to face. She then chased him out the outside door of the apartment building. After realizing that she was naked, the victim ran back into her apartment and immediately summoned the police.

Officer Bergmark of the Grand Island Police Department responded to the call and arrived at the victim's apartment approximately 5 minutes after she had summoned the police. After taking a short time to regain her composure, the victim described the incident and her assailant for Bergmark. Bergmark testified that the victim did not hesitate in answering his questions regarding the description of her assailant, and testified that her answers were "clear and concise."

The victim testified that before going to bed, she had "definitely locked" the sliding screen door and had attempted to lock the sliding glass door, but because she "had been having

some problems with the latch" on the sliding glass door, she could not be sure that it was locked. Before leaving the victim's apartment, Bergmark inspected the sliding screen door and sliding glass door to the apartment and found that the screen door was unlocked. The victim testified that after she returned to her apartment, she checked the sliding glass door and found that it was not locked, so she "relocked" it.

On September 23, 1987, the victim met with Captain Hetrick and Lieutenant Shum of the Grand Island Police Department to create a composite sketch of her assailant. After this sketch had been constructed, she viewed a photographic lineup consisting of an array of six photographs and determined that a picture of her assailant was not included.

On September 28, the victim again met with Hetrick to view another photographic lineup. Like the one she initially viewed, this lineup also consisted of an array of six individuals. However, unlike the first one, the September 28 lineup included a photograph of Tyrrell. The photograph of Tyrrell differed from the others in the lineup in that Tyrrell's picture was one which had been used for a newspaper publication, while the other five were more typical of photographs taken by police when "booking" a criminal suspect. Hetrick testified that law enforcement personnel had mentioned Tyrrell's name as a possible suspect, but because he was unaware of Tyrrell's prior criminal record, Hetrick obtained the newspaper photograph for use in the photographic lineup.

When reviewing the September 28 photographic lineup, the victim indicated that Tyrrell appeared similar to her assailant. Hetrick testified (without objection by Tyrrell) that the victim placed her hand across the bottom portion of the face pictured and "stated that the hair and the forehead and the eyes are correct," but because of the expression on his face, she could not be sure. (The picture of Tyrrell within the September 28 photographic lineup is a closeup of Tyrrell smiling, but the assailant did not smile during the assault.) The victim testified she told Hetrick that " '[y]ou are after somebody who looks just like this.' . . . 'I realize that that might sound crazy because it looks like you cut this picture out of a magazine and used it as a filler.' " Again referencing the photograph of Tyrrell in the

September 28 lineup, the victim also testified that "[i]t looked like the person but I thought I was crazy because it looked like they cut it out of a magazine so I just disregarded it."

Sergeant Dreyer of the Kearney Police Department testified that Tyrrell had been arrested on October 26, 1987, in connection with a burglary in Kearney. As a result of that arrest and in the course of following standard arrest procedures, Kearney police photographed Tyrrell. The Kearney Police Department was not at that time aware of any pending investigation involving Tyrrell. At the hearing on the motion to suppress the victim's in-court and out-of-court identifications of Tyrrell, the State conceded that the Kearney police had illegally arrested Tyrrell.

On November 5, 1987, Dreyer visited the Grand Island Police Department while obtaining background information in connection with an unrelated case. During this visit, Dreyer met with Hetrick and, in the course of their conversation, discussed the assault on the victim in this case and the apparent burglary for which Tyrrell had been arrested in Kearney. Hetrick then showed Dreyer the photograph of Tyrrell that the Grand Island police had used in the September 28 photographic lineup, and Dreyer indicated that Tyrrell had a somewhat different appearance when he was arrested by the Kearney police on October 26. Dreyer subsequently provided Hetrick with a photographic lineup consisting of an array of eight photographs, including the photograph of Tyrrell which had been taken when he was arrested by Kearney police on October 26.

The victim again met with Hetrick on November 11, 1987, to view the photographic lineup which Dreyer had provided. At that time the victim identified the photograph of Tyrrell as being that of her assailant. She also identified Tyrrell as her assailant during Tyrrell's trial and at the hearing on the motion to suppress the in-court and out-of-court identifications of Tyrrell. The district court overruled Tyrrell's objection to the use of the photograph which the Kearney police had obtained when they illegally arrested Tyrrell.

However, the district court granted Tyrrell's motion to suppress statements he had made to one Detective Sorenson of

the Lincoln Police Department, admitting to six 1985 assault/burglary incidents in Lancaster County, on the ground they had been induced by a promise of immunity and were thus not made voluntarily. In four of the cases Tyrrell had attempted to sexually assault his victims. In two of the incidents Tyrrell made contact with the victims in their homes but did not physically attack them; when these victims resisted, Tyrrell left their residences.

Tyrrell's first assignment of error claims that the trial court erred in receiving the victim's out-of-court identification of Tyrrell. The basis for this contention is that the identification was derived from the "fruit of the poisonous tree," i.e., that the photograph which the victim identified was obtained by the Grand Island Police Department as a result of the Kearney Police Department's illegal arrest of Tyrrell.

At the hearing on the motion to suppress the use of the photograph to identify Tyrrell, the prosecutor, for purposes of the hearing, conceded, as noted earlier, that Tyrrell's arrest was illegal. Despite this concession, it is apparent that the State is entitled to use the photograph which was taken by the Kearney police. The issue presented here is one which the Supreme Court of California considered in *People v. McInnis*, 6 Cal. 3d 821, 494 P.2d 690, 100 Cal. Rptr. 618 (1972), a case involving circumstances very similar to those presented here.

In *McInnis*, the defendant robbed a liquor store, and witnesses later identified him from a photograph which had been obtained as a result of an illegal arrest on another charge by an independent and separate law enforcement agency. (The Pasadena police were investigating the liquor store robbery, while Los Angeles authorities had made the illegal arrest.) The defendant contended that the use of the photograph to identify him was unlawful and that the in-court identifications made by witnesses were tainted by this use.

In part quoting *Wong Sun v. United States*, 371 U.S. 471, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963), the California court stated at 6 Cal. 3d at 824-26, 494 P.2d at 692-93, 100 Cal. Rptr. at 620-21:

> "We need not hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather, the

more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' [Citation.]" The court indicated (at p. 487 [9 L.Ed.2d at p. 455]) that where "the connection between the lawless conduct of the police and the discovery of the challenged evidence" is so attenuated as to dissipate the taint, such evidence is admissible.

. . . .

The taking of a photograph during the booking process is standard police procedure . . . bearing no relationship to the purpose or validity of the arrest or detention. Commonly known as "mug shots," the photos are kept in permanent files regardless of the eventual disposition of the case; indeed, thousands of persons ultimately found to be entirely innocent undoubtedly have their photographs, as well as fingerprints, on record with law enforcement agencies. [Citations omitted.]

To hold that all such pictures resulting from illegal arrests are inadmissible forever because they are "fruits of the poisonous tree" would not merely permit the criminal "to go free because the constable has blundered" (Cardozo, J., in *People v. Defore*, (1926) 242 N.Y. 13, 21 [150 N.E. 585]) but would allow the criminal immunity because another constable in another jurisdiction in another case had blundered. It would in effect be giving a crime insurance policy in perpetuity to all persons once illegally arrested: if the photograph of a person obtained because of such an arrest becomes instrumental in the identification of that person for a crime committed many years later, it could be urged that *but for* the old illegal arrest the criminal would not have been identified. Rationally, however, a "but for" relationship alone is insufficient to render the photograph inadmissible since it cannot be said that many years later the illegality of the earlier arrest was being "exploited." As declared in *United States v. Edmons* (2nd Cir. 1970) 432 F.2d 577, 584: "We

are not obliged here to hold that when an arrest made in good faith turns out to have been illegal because of lack of probable cause, an identification resulting from the consequent custody must inevitably be excluded."

In the case at bar, while the time span between the illegal arrest and the robbery was not one of years but only a month, nevertheless the principle remains the same, and there is no evidence whatever of exploitation. . . . That the robbery victim and witness were shown defendant's more recent likeness, in preference to outdated photographs, suggests a reasonable police procedure rather than exploitation of an isolated arrest deemed improper.

(Emphasis in original.)

The *McInnis* analysis is equally applicable in the present case. Furthermore, the approach taken by the *McInnis* court is the approach generally followed. See, e.g., *United States ex rel. Moore v. Lane*, 612 F.2d 1046 (7th Cir. 1980); *People v. Pettis*, 12 Ill. App. 3d 123, 298 N.E.2d 372 (1973); *Kinsey v. State*, 639 S.W.2d 486 (Tex. App. 1982); *State v. Price*, 27 Ariz. App. 673, 558 P.2d 701 (1976). See, also, *Robinson v. State*, 53 Md. App. 297, 452 A.2d 1291 (1982), which follows *McInnis* and cites numerous cases from various jurisdictions, stating:

We think that the approach taken in these cases is the correct one, whether expressed as "attenuation" or simply as a rational and commonsense application of the "fruit of the poisonous tree" doctrine. In the absence of evidence (or a reasonably firm and detailed proffer of evidence) tending to show that appellant's . . . arrest was not only illegal but was merely a pretext for a general exploratory search (as in *Davis v. Mississippi*, [394 U.S. 721, 89 S. Ct. 1394, 22 L. Ed. 2d 676 (1969)]) or for gathering evidence in this case (as in *United States v. Crews*, [445 U.S. 463, 100 S. Ct. 1244, 63 L. Ed. 2d 537 (1980)]), a routine "booking" photograph taken as a consequence of that arrest would not be suppressible as tainted fruit in this proceeding.

*Robinson v. State, supra* at 312, 452 A.2d at 1299.

While Tyrrell relies on *Davis v. Mississippi*, 394 U.S. 721, 89 S. Ct. 1394, 22 L. Ed. 2d 676 (1969), in arguing that the

photograph which Grand Island authorities obtained from the Kearney Police Department should not be admissible, *Davis* is easily distinguishable from the case presently before us.

In *Davis*, Meridian, Mississippi, police officers arrested the defendant without probable cause while investigating the rape for which the defendant was eventually charged. In investigating the rape, Meridian authorities illegally (i.e., without warrants or probable cause) arrested and fingerprinted the defendant and numerous other youths. Fingerprints obtained in the course of these arrests linked the defendant to the crime. The U.S. Supreme Court concluded that this fingerprint evidence was obtained in violation of the defendant's protection against unreasonable search and seizure under the fourth amendment, and therefore declared that this evidence could not be used to convict the defendant.

Unlike the situation in *Davis*, the investigating Kearney law enforcement agency in this case did not act illegally for the purpose of gathering the evidence used to convict Tyrrell. Although Grand Island police officials did use the photograph which it obtained from Kearney authorities, that photograph had been obtained by a separate law enforcement agency pursuant to a separate, albeit illegal, arrest on an unrelated charge. Neither the record nor Tyrrell suggests that the Grand Island police conspired with Kearney police to facilitate the acquisition of the photograph used to identify the present victim's assailant.

In sum, *People v. McInnis*, 6 Cal. 3d 821, 494 P.2d 690, 100 Cal. Rptr. 618 (1972), provides the correct rule to follow, and the facts of the present case require the same result as that reached in *McInnis*.

In addition to the foregoing, it should be noted that the prime purpose of the rule excluding evidence seized in violation of the fourth amendment is deterrence of future unlawful police conduct. *United States v. Calandra*, 414 U.S. 338, 94 S. Ct. 613, 38 L. Ed. 2d 561 (1974). In deciding whether evidence should be suppressed in any given case, a court must properly weigh the deterrent effect of suppression against its societal costs. See, e.g., *United States v. Janis*, 428 U.S. 433, 96 S. Ct. 3021, 49 L. Ed. 2d 1046 (1976). Where little or no deterrence

will result from suppression, suppression is inappropriate, for where the reason for the exclusionary rule ceases, its application also must cease. *United States v. Fitzgerald*, 724 F.2d 633 (8th Cir. 1983), *cert. denied* 466 U.S. 950, 104 S. Ct. 2151, 80 L. Ed. 2d 538 (1984).

In this case, Tyrrell's illegal arrest by the Kearney police was entirely unrelated to the investigation of the assault of the victim. Consequently, exclusion of the photograph which was obtained as a result of Tyrrell's illegal arrest has no deterrent effect on unlawful police conduct.

It is within the trial court's discretion to admit or exclude evidence, and such rulings will be upheld on appeal absent an abuse of discretion. *State v. Chapman, ante* p. 369, 451 N.W.2d 263 (1990); *State v. Foley, ante* p. 304, 450 N.W.2d 694 (1990). See, also, *State v. Roach, ante* p. 620, 452 N.W.2d 262 (1990). Because the trial court did not abuse its discretion by overruling Tyrrell's objection to the use of the photograph which Kearney authorities supplied to the Grand Island police, Tyrrell's first assignment of error is without merit.

As his second assignment of error, Tyrrell argues that the victim's in-court identification of him as her assailant "was the result of unnecessarily suggestive and prejudicial procedures which created a substantial likelihood of misidentification so as to deprive . . . Tyrrell of a fair trial . . . ."

It should be noted at this point that Tyrrell made no objection when the victim identified him at the trial. Thus, Tyrrell waived his right to assert error arising from the trial court's reception of this evidence. See, *State v. Welsh*, 232 Neb. 219, 440 N.W.2d 225 (1989); *State v. Cox*, 231 Neb. 495, 437 N.W.2d 134 (1989). Nonetheless, the fact is that the evidence was admissible in any event.

Tyrrell argues that the procedures which the Grand Island police employed to identify Tyrrell were unduly suggestive due to the type of photograph (i.e., one obtained from a local newspaper) used in the September 28 photographic lineup and because Tyrrell was the only person whose picture was repeated in the November 11 photographic lineup. This contention ignores the fact that at both the hearing on the motion to suppress and at trial, based upon her independent recollection

of her assailant from the night of the assault, the victim identified Tyrrell as the assailant. The victim further testified that she did not even realize that the two different pictures of Tyrrell were pictures of the same individual until Hetrick so informed her after she had identified Tyrrell in the November 11 photographic lineup.

Even assuming, despite the record's lack of support for such a finding, that the photographic lineups used by the Grand Island police were unduly suggestive, the victim's in-court identification of Tyrrell was admissible, since the victim's identification was based upon her independent recollection of the night of the assault. See, *State v. Hunt*, 212 Neb. 304, 322 N.W.2d 624 (1982); *State v. Price*, 229 Neb. 448, 427 N.W.2d 81 (1988). Thus, the trial court properly allowed the victim to identify Tyrrell during the trial.

Tyrrell's third assignment of error alleges that the State presented insufficient evidence to prove that he committed burglary because the State presented insufficient evidence to show that a "breaking" had occurred.

In determining the sufficiency of the evidence to sustain a conviction, it is not the province of this court to resolve conflicts in the evidence, pass on the credibility of witnesses, determine the plausibility of explanations, or weigh the evidence; such matters are for the finder of fact. The verdict must be sustained if, taking the view most favorable to the State, there is sufficient evidence to support it. *State v. Frazier,* ante p. 107, 449 N.W.2d 230 (1989); *State v. Johns*, 233 Neb. 477, 445 N.W.2d 914 (1989); *State v. Wokoma*, 233 Neb. 351, 445 N.W.2d 608 (1989); *State v. Wyatt, ante* p. 349, 451 N.W.2d 84 (1990).

Section 28-507(1) states: "A person commits burglary if such person willfully, maliciously, and forcibly breaks and enters any real estate or any improvements erected thereon with intent to commit any felony or with intent to steal property of any value." Evidence of any act of physical force, however slight, by which the obstruction to entering is removed is sufficient to prove a breaking. The opening of a closed door is a "breaking" within the definition of burglary. *State v. Sutton*, 220 Neb. 128, 368 N.W.2d 492 (1985); *State v. Jones*, 230 Neb. 968, 434

N.W.2d 333 (1989); *State v. Zemunski*, 230 Neb. 613, 433 N.W.2d 170 (1988).

The victim testified that she had "definitely locked" the screen door on the night of her assault. While inspecting the apartment immediately after the assault, Bergmark inspected the sliding screen door and sliding glass door to the apartment and found that the screen door was unlocked. The victim further testified that she had locked the deadbolt lock on her other apartment door before retiring, but observed that her assailant "had obviously unlocked the doors before he came into [her] bedroom because all he did was reach out and pull on the knob" when he exited the apartment. These facts, combined with the victim's observation of the intruder's having gained entrance to her apartment, provide sufficient evidence of a breaking to convict Tyrrell of burglary under § 28-507(1).

Tyrrell's fourth assignment asserts that the district court judge improperly considered the suppressed statements which Tyrrell had made to Sorenson when determining Tyrrell's sentences. With respect to the statements which Tyrrell made to Sorenson, the district court judge's journal entry states:

> The defendant's statements made by the defendant to Detective Sorenson of the Lincoln, Nebraska Police Department on November 2, 1987, were induced by a promise of immunity, are involuntary statements, and may not be used by the State in this case. The defendant's Motion to Suppress should be granted.

Once again, it must be noted that Tyrrell and his attorney had the opportunity to and apparently did review the presentence report prior to the sentencing hearing and did not object to the contents of that report. The failure to object to the presentence report precludes Tyrrell from challenging it in this appeal. *McKisic v. State*, 238 Ga. 644, 234 S.E.2d 908 (1977). However, the facts do not establish error in any event.

At the sentencing proceeding the district court judge stated:

> I've read carefully the presentence report and all the other reports that have been attached thereto.
>
> The sentences I'm about to give you reflect my feelings with regard to that report. I, of course, do not think you are a good candidate for probation because I think there is

a substantial risk you are going to engage in further crimes.

You've been sentenced to the penitentiary before for other crimes, hasn't had — seemed to have had any effect on you.

The report contains references to the involuntary admissions Tyrrell made to Sorenson noted earlier in this opinion. In that connection, Tyrrell focuses on the district court judge's statements: "I've read carefully the presentence report and all the other reports that have been attached thereto. The sentences I'm about to give you reflect my feelings with regard to that report." Tyrrell then argues that these statements indicate that the judge improperly considered Tyrrell's statements to Sorenson when sentencing Tyrrell.

In making his argument, Tyrrell relies on *United States v. Tucker*, 404 U.S. 443, 92 S. Ct. 589, 30 L. Ed. 2d 592 (1972), in which the sentencing court specifically considered the defendant's three prior felony convictions and imposed the maximum term allowed. It was later found that two of the three convictions noted by the sentencing court were constitutionally invalid because the accused was denied his right to counsel. The U.S. Supreme Court stated at 404 U.S. at 446-47:

It is surely true . . . that a trial judge . . . generally has wide discretion in determining what sentence to impose. It is also true that before making that determination, a judge may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information he may consider, or the source from which it may come. . . .

But these general propositions do not decide the case before us. For we deal here, not with a sentence imposed in the informed discretion of a trial judge, but with a sentence founded at least in part upon misinformation of constitutional magnitude. . . . The record in the present case makes evident that the sentencing judge gave specific consideration to the respondent's previous convictions before imposing sentence upon him. Yet it is now clear that two of those convictions were wholly unconstitutional . . . .

Tyrrell further relies upon *State v. Jones*, 213 Neb. 1, 328

N.W.2d 166 (1982), a case in which the sentencing court, solely upon the basis of testimony given by the defendant under a grant of immunity in a previous case, found that aggravating circumstances existed which justified imposition of the death penalty. This court remanded the case for a new sentencing hearing, stating:

> We therefore hold that where the defendant has testified in a previous criminal case under a lawful grant of immunity, the sentencing court in a subsequent criminal case cannot consider such testimony or any information directly or indirectly derived from it in determining whether a death sentence should be imposed under the provisions of § 29-2523 and related statutes.

*State v. Jones, supra* at 15, 328 N.W.2d at 174.

While in this case the district court did find that Tyrrell's statements to Sorenson were induced by a promise of immunity and should be suppressed, the facts here mirror neither *State v. Jones, supra*, nor *United States v. Tucker, supra*. In *Tucker*, the sentencing court specifically considered a defendant's prior convictions which later proved to be "wholly unconstitutional." *United States v. Tucker, supra* at 404 U.S. at 447. Unlike that situation, the district court judge in the case now before us merely made general benign statements, saying: "I've read carefully the presentence report and all the other reports that have been attached thereto. The sentences I'm about to give you reflect my feelings with regard to that report." The references in the report to, and discussion of, Tyrrell's statements to Sorenson comprise only a small part of the presentence report, and it cannot be concluded that the district court judge's general statements demonstrate that he specifically considered Tyrrell's involuntary statements to Sorenson in determining an appropriate sentence. The canon that in a case tried to the court without a jury there is a presumption that the trial court, in reaching its decision, only considered evidence that is competent and relevant, *State v. Sheridan*, 230 Neb. 979, 434 N.W.2d 338 (1989), has equal application to a sentencing court's consideration of a presentence report. Thus, on appeal from a criminal sentence, it is presumed that in considering a presentence report the sentencing judge considered only

material which is relevant and competent. Indeed, the district court judge's other statements in this connection confirm that he relied on information contained within the presentence report exclusive of Tyrrell's immunized statements in rendering his sentence. The district court judge stated: "I, of course, do not think you are a good candidate for probation because I think there is a substantial risk you are going to engage in further crimes. You've been sentenced to the penitentiary before for other crimes, hasn't had — seemed to have had any effect on you." Thus, there is no reason not to indulge in the appellate presumption described earlier. Furthermore, as developed more fully in connection with the remaining two assignments of error, the record, exclusive of references to Tyrrell's immunized statements, clearly supports the sentences imposed.

That brings us to the fifth and sixth assignments of error, which assert that the district court abused its discretion by imposing excessive sentences and requiring that Tyrrell serve these sentences consecutively rather than concurrently.

Addressing first Tyrrell's claim that the respective lengths of the sentences imposed were excessive, it cannot be said that the district court abused its discretion. First degree sexual assault is a Class II felony, § 28-319(2), punishable by 1 to 50 years' imprisonment, Neb. Rev. Stat. § 28-105 (Reissue 1985), while burglary is a Class III felony, § 28-507(2), punishable by 1 to 20 years' imprisonment, § 28-105. The controlling rule is that a sentence within the statutorily prescribed limits will not be disturbed on appeal absent an abuse of discretion. *State v. Letscher, ante* p. 858, 452 N.W.2d 767 (1990); *State v. Von Busch, ante* p. 119, 449 N.W.2d 237 (1989); *State v. Von Dorn, ante* p. 93, 449 N.W.2d 530 (1989).

In the course of finding that Tyrrell was not a mentally disordered sex offender, the district court correctly noted the psychiatric opinion that there exists a substantial risk that Tyrrell, given the opportunity, would engage in sexual misconduct again. Under the circumstances, the sentences imposed, while they are the maximum indeterminate sentences allowable, Neb. Rev. Stat. § 83-1,105(1) (Reissue 1987), cannot be said to be excessive and thus do not individually constitute an

abuse of discretion.

Nor did the district court abuse its discretion by imposing consecutive rather than concurrent sentences. See *State v. Ellefson*, 214 Neb. 747, 336 N.W.2d 88 (1983) (trial court held not to have abused its discretion in imposing consecutive terms of not less than 5 nor more than 10 years for burglary and not less than 15 nor more than 25 years for first degree sexual assault where sentences imposed were within the statutory guidelines).

Moreover, this court would not, under the power conferred upon it by Neb. Rev. Stat. § 29-2308 (Reissue 1989), independently impose consecutive prison sentences of shorter terms than did the district court.

AFFIRMED.