IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. YOUNG

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

SHAWN K. YOUNG, APPELLANT.

Filed December 17, 2024.    No. A-24-208.

Appeal from the District Court for Lancaster County: SUSAN I. STRONG, Judge. Affirmed.

Mark E. Rappl, of Naylor & Rappl Law Office, for appellant.

Michael T. Hilgers, Attorney General, and Melissa R. Vincent for appellee.

RIEDMANN, MOORE, and BISHOP, Judges.

BISHOP, Judge.

## I. INTRODUCTION

Shawn K. Young pled no contest and was found guilty of first degree false imprisonment, terroristic threats, and third degree assault. The Lancaster County District Court sentenced him to an aggregate term of 7 years' imprisonment, plus 18 months of post-release supervision. On appeal, Young raises multiple claims related to his sentencing. He contends that his sentences were excessive and were based on misinformation and improper victim impact statements. He also argues that the prosecutor engaged in prosecutorial misconduct by asking the court to consider improper sentencing factors and by arguing to the court that Young attempted to sexually assault the victim. Finally, Young claims his trial counsel was ineffective for failing to object to the above-alleged misinformation, improper victim impact statements, and prosecutorial misconduct. We affirm.

- 1 -

## II. BACKGROUND

At approximately 2:15 a.m. on November 19, 2022, the victim, K.S., age 20 at the time, had finished working at a bar and restaurant business ("business") in downtown Lincoln, Nebraska. She started walking toward a nearby parking garage where her car was parked. A man, subsequently determined to be Young, age 22 at the time, was following approximately 10 yards behind her. K.S. entered the parking garage elevator lobby about a minute later and proceeded up the stairway. Young followed her, keeping the same distance. According to K.S., she had noticed Young following her and she heard him getting directions from his phone to a nearby hotel, but when the phone directions indicated he missed his turn, he turned it off. When K.S. unlocked her car, she turned and saw Young lunging at her. When she screamed, Young put his fingers in her mouth to stop her screaming, then pushed her against her car. They ended up on the ground and Young opened the rear passenger door on the driver's side. Young grabbed K.S.' legs to try to get her into the car. K.S. eventually bit down hard on Young's hand, which caused Young to run away. K.S. ran down the garage ramp and found people outside smoking. After K.S. told the people outside what happened, two male individuals from that group went into the garage to search for Young. They found a white hoodie on the ground, and while on the second floor of the garage, they saw Young crawling on the ground underneath or behind cars trying to get through a fence that divided the garage. They saw Young slip through the fence and get into a white pickup truck. He then drove off. The two males pursuing Young ran to the entrance of the garage where they saw Young trying to pay, so they grabbed his wallet and kept him there until law enforcement arrived.

On November 21, 2022, a complaint was filed in the county court for Lancaster County, Nebraska, charging Young with attempted kidnapping. On May 10, 2023, an information with the same charge was filed in the district court. An amended information was filed on December 21, charging Young with first degree false imprisonment, terroristic threats, and third degree assault.

On December 21, 2023, Young pled no contest to all three counts charged in the amended information. After the district court provided various advisements to Young, it requested that the plea agreement be stated for the record. The State represented that it agreed to reduce the original attempted kidnapping charge for the three charges set forth in the amended information. Defense counsel added, and the State agreed, that "there was no sexual penetration or sexual contact . . . as required for a finding under Nebraska's Sexual Offender Registry Act." The State added that "after taking the deposition of the victim . . . there is an agreement that the elements of sexual contact and sexual penetration are not present in this offense, and therefore registration does not apply." The following factual basis was then provided by the State.

On November 19th of 2022, at approximately 2:23 in the morning, officers of the Lincoln Police Department were dispatched to [the business] at [address] on an assault that had just taken place.

Upon arrival, officers contacted the victim in this case, . . . [K.S.]. She was sitting on an outside patio area surrounded by people. She was crying, with blood lining the outside of her mouth, and she was visibly shaken. She stated that she had just got off work, working at [the business], at about 2:00 in the morning, and she was walking along the

north side of [a street] to get to her vehicle, which was parked on the third floor of the [garage], located at [address].

While walking, she stated that she noticed an individual, later identified as the defendant in this case, . . . Young, to be following her in close proximity. She continued up the stairs at the garage, to where her car was parked.

As she approached her vehicle, she unlocked it and heard noise behind her. At that time, [K.S.] turned around and observed the defendant to be directly behind her. She stated that he grabbed her around the arms and pushed her against the rear driver's side of the vehicle.

She stated that she started to scream, but the defendant stuck his fingers in her mouth, which prevented her from screaming further. He then tackled her to the ground at the driver's side of her vehicle. He continued to shove his fingers into her mouth and used his other hand to push down on her face and head into the concrete, which prevented her from being able to escape and did restrain her.

She stated that the defendant was pushing her onto the ground as he [was] atop of her, and then he opened the rear driver's side door of her vehicle and he grabbed her around the lower part of her legs and attempted to drag her into the vehicle. He started – She started to kick her legs to get him off of her, but was unable to fend him off.

She said that she then bit down on his hand that was in her mouth, causing him to back away.

He closed the back door of her vehicle and took off running.

She stated that she then ran down the parking garage and contacted the group of people that she was with when the officers arrived. The group of people were individuals that were at [the business] prior to closing, that she had waited on as part of her employment at [the business].

When she told those individuals what had occurred, one of the individuals, an Andrew [P.], and another male went to the [garage] and could see the defendant hiding between vehicles, eventually getting into a truck and going down [to] the gate. [Andrew] and another individual ended up stopping the defendant at the gate, grabbing his wallet and holding him there until police arrived.

A separate officer went to the [garage], where he did locate the defendant, as well as [Andrew] and another male near the gate. The defendant was wearing shorts, a short-sleeved shirt and had a broken necklace around his neck. He had an abrasion to his left knee and blood was coming from both of his hands. He informed the officer that he was attacked by a blond girl and got, quote, bit up. He was then placed into custody.

When [K.S.] was initially describing the male who attacked her, she stated he was wearing a hoodie at the time.

Officers viewed video surveillance of the incident and could see the defendant following [K.S.] into the parking garage from the street, at close proximity. He's following her up the stairs.

The attack by her car is not on video, but you can then see [K.S.] running down the ramp, and the defendant is in the stairway. And you can see, in the video surveillance,

initially he was wearing a hoodie, and then later he throws the hoodie down the stairwell. And the hoodie was later retrieved by officers.

It -- His hands -- the defendant's hand sample was collected and swabbed. His hand sample and the hoodie he was wearing at the time were sent to the Nebraska State Patrol Crime Lab, which did confirm the presence of blood, and included the defendant, . . . Young, and [K.S.'] DNA within both of those samples.

[K.S.] was terrorized during this time and afraid.

All of those events occurred in Lancaster County, Nebraska.

She did have a cut to her lip and an injury that lasted even after the incident occurred.

The district court accepted Young's pleas and found him guilty of the three charges. A presentence investigation was requested, and a sentencing hearing was scheduled. A February 25, 2024, statement by Young titled "What Happened the Night of the Incident," was included in the presentence investigation report (PSR). In that document, Young stated he "had gone out to the bar" with a coworker and the coworker's cousin, and although he "planned on being the DD," he "later decided to drink." He decided to "run to the parking garage some blocks away, grab the truck," and then pick up the others. He did not park the vehicle and could not remember which floor it was on, but thought it was on the third floor. He "walked in behind a blonde woman" he did not know, went up the stairs, and "walked into the parking area behind her." He claimed that as he "approached the garage and went up the stairs, [he] was walking fast because of the cold and because [he] typically walk[s] quickly" for his job. He was using the cousin's phone because his phone had "died." As he "got to the 3rd [floor], [he] could hear the navigation repeating that [he] had arrived at [his] destination." He started looking for the vehicle and "was looking down at [his] phone and heard a scream." He "bumped into the blonde woman, looked up, and she started to hit [him]." He described what happened next as follows.

After a few quick strikes from her I instinctively put my hands out. I was taken completely by surprise but do remember her grabbing my hand an[d] biting my fingers. I pulled my fingers out quickly, pushed her back, and tripped, landing on both of my knees. At that point, I was angry, got up, pushed her down and ran up toward the 4th floor.

I didn't see the truck there either so I went down to the 2nd floor. I then ran into two guys who started questioning me. They asked what happened to my hands and knees, said that I attacked a girl, and that the police were coming. I then said I was going to wait for the police with them but then the taller skinny kid had gotten up in my face screaming at me and I felt panicked and threatened and ran up the ramp. I found the truck and drove down the ramp to the exit. I tried to pay but the two guys had surrounded my truck. I told them I would wait for the police but that I was going to pay. One kid had snatched my wallet before able to pay so I then just sat there awaiting the police. An officer pulled in front of my vehicle and then instructed me to get out. He asked me what had happened to my hands and knees, and I told him I was attacked. I was then given a breathalyzer and detained.

The sentencing hearing took place on February 29, 2024. The district court stated that it had reviewed the PSR, "several letters sent in," the prosecutor's letter, a "notation of jail calls," and defense counsel's letter. Defense counsel asked if the court had received the "character letters" submitted on behalf of Young and the court confirmed that was what it was "talking about." Defense counsel requested that counsel's letter, Young's "statement of the facts," and the "character letters" all be included in the PSR; the court acknowledged that "[t]hey will be."

Defense counsel argued that "this has been one of the oddest cases . . . because it's a very violent offense" and that "violent offenses typically" have a "criminal history." Counsel stated that it was "perplexing" how someone with "no criminal history, an LSCMI of six, no prior incidents of violent behavior . . . never been accused of anything like this, no issues with school. . . . How do we get from that to randomly attacking a woman in a parking garage?" Counsel acknowledged that even under Young's version of the facts, "he escalated the force, threw her down and -- injured her," and that was a "terrible decision" he would have to live with the rest of his life. "He made a bad decision to drink that night. He reacted terribly when he startled [the victim]. He injured her. He scared the bejesus out of her, and this could have gotten a lot worse and luckily it -- it didn't."

Young himself added that he did take responsibility, that he understood the "gravity" of the situation, and that he felt "very bad about the events." He apologized to the victim, saying he "did not mean to hurt [her] or to scare [her] from [his] actions." He told the district court that he was "not a bad person," that he "lost a lot because of this situation," and will no longer be able to attain a goal that he had "spent years working toward," but that it was his fault.

The State asked the district court to "put little weight" on the character letters submitted because they did not mention the facts of the case, some seemed to deny that Young "did anything," and others "seem[ed] to request the Court not to hold the defendant accountable." The State pointed out that "what they all have in common is that none of them discuss [the victim]. . . . They don't consider how she was affected. . . . how her family was affected. . . . how her whole life was changed in three seconds or three minutes." The State argued that the victim was a "better historian and more credible" than Young. It noted that Young claimed the victim "grabbed his hand and bit his finger," that "we all must question why would she do that," and that it made "more sense" that Young had his "hand over her mouth and shoving his fingers into her mouth to stop her from screaming, and that is how she bit his hand." The State also questioned why Young did not explain opening the back car door. The State noted that the victim did not "try to infer certain things that didn't occur about what Mr. Young was trying to do, whether he was trying to do anything sexually with her. She was honest about what she remembered and she can remember things better than Mr. Young, who was clearly intoxicated at the time."

The State suggested that the district court might "empathize[]" with Young "after looking at his lack of criminal history, after reading the letters and his statements [in] the PSI, but the State would submit that he doesn't deserve that credit, and his statements quite frankly can't be trusted." It added:

> The State would submit that the evidence proves that [the victim] fought back against . . . Young's deliberate attempt to kidnap and sexually assault her. This Court has seen many people convicted of very serious sexual assault offenses, and a lot of times sexually deviant people go without detection for years and they come before the Court on a 1B felony having no criminal history whatsoever. So that's not entirely surprising to any

of the parties here. This could have been the beginning act and something that [the victim] was strong enough, luckily, to fight back.

So again, the State would submit that sentencing . . . Young to anything less than the maximum imprisonment sentence on each count consecutively would send a message that Nebraska courts do not take the safety of its female citizens seriously and would encourage its citizens to do so. So that is the sentence the State is asking for.

The district court informed Young that he was not a "good candidate for probation despite [his] lack of criminal history." It explained as follows.

If I believed your statement of the facts here, I would have to believe that this young woman is lying and made this story up. That is just not consistent with . . . all the other evidence we have. . . . I would have to believe that she's the one that first hit you. I don't believe that.

The victim in this case has been consistent in her story. Her story is the one that makes sense, and that is that you followed her closely into a parking garage at 2 a.m., that you attacked her, that you threw down her keys and her wallet, so you weren't concerned about stealing her car or getting money. Instead, you tried to drag her into the back seat of the car, and she fought back and was able to resist your attack.

But I think that this is an extremely dangerous crime and a violent one, and that I do agree with the State that you should serve some time in prison.

So having regard for the nature and circumstances of the crimes and the history, character and condition of the defendant, the Court finds that there are substantial and compelling reasons for imprisonment of the defendant and that a lesser sentence would depreciate the seriousness of the defendant's crimes and promote disrespect for the law.

Young was then informed of his sentences and the conditions of his post-release supervision.

## III. ASSIGNMENTS OF ERROR

Young assigns, reordered, that the district court erred by (1) sentencing Young "based upon misinformation" and (2) "allowing the introduction of improper victim impact statements at the sentencing hearing." He also claims the prosecutor engaged in prosecutorial misconduct by (3) asking the court to consider "improper sentencing factors," and (4) arguing that Young "attempted to sexual[ly] assault the victim." Young contends that his trial counsel was ineffective for failing to object to the four errors alleged above. Finally, Young claims his sentences were excessive.

## IV. STANDARD OF REVIEW

A sentence imposed within the statutory limits will not be disturbed on appeal absent an abuse of discretion by the trial court. *State v. Miller*, 315 Neb. 951, 2 N.W.3d 345 (2024).

When a defendant has not preserved a claim of prosecutorial misconduct for direct appeal, an appellate court will review the record only for plain error. See *State v. Mrza*, 302 Neb. 931, 926 N.W.2d 79 (2019).

An appellate court may find plain error on appeal when an error unasserted or uncomplained of at trial, but plainly evident from the record, prejudicially affects a litigant's

substantial right and, if uncorrected, would result in damage to the integrity, reputation, and fairness of the judicial process. *Id*.

Whether a claim of ineffective assistance of counsel may be determined on direct appeal is a question of law. *State v. Dap*, 315 Neb. 466, 997 N.W.2d 363 (2023). In reviewing claims of ineffective assistance of counsel on direct appeal, an appellate court decides only whether the undisputed facts contained within the record are sufficient to conclusively determine whether counsel did or did not provide effective assistance and whether the defendant was or was not prejudiced by counsel's alleged deficient performance. *Id*.

## V. ANALYSIS

### 1. District Court's Alleged Reliance on Misinformation

Young contends the district court abused its discretion and violated his constitutional right to due process by considering evidence that was not supported by the record. He directs us to the following italicized statement made by the court at the sentencing hearing.

> The victim in this case has been consistent in her story. Her story is the one that makes sense, and that is that you followed her closely into a parking garage at 2 a.m., that *you attacked her, that you threw down her keys and her wallet, so you weren't concerned about stealing her car or getting money*. Instead, you tried to drag her into the back seat of the car, and she fought back and was able to resist your attack.
>
> But I think that this is an extremely dangerous crime and a violent one, and that I do agree with the State that you should serve some time in prison.

Young argues, "There is absolutely no evidence in the presentence report to support the trial judge's claim that [Young] threw down the victim's keys and wallet." Brief for appellant at 19.

We agree with Young that the district court was mistaken when it said Young threw the victim's keys and wallet. However, we agree with the State that although the court was "mistaken on that point, its mistake was not material." Brief for appellee at 13. In K.S.' statement to law enforcement, she was asked if Young was trying to take anything from her. She responded that she "had cash" and that her "bel[t] bag opened" and her keys and phone and "all my cash, my wallet, my card – all was there for the taking and he didn't even – he even dropped his phone and ran off without it. So, I don't think he was trying to . . .," at which point the investigator interrupted her to inquire about Young's phone. K.S. explained in her deposition that she did not know if Young was trying to steal from her, so she dropped her things, which included her keys and a bag "like a fanny pack," and she threw her phone under her car. K.S. also stated that her bag was wide open "so anything that was in it fell out," including money on the ground. K.S. confirmed that Young did not try to take anything from her, including the money. Therefore, although the court was mistaken about Young throwing down K.S.' keys and wallet, it was not mistaken in its impression that Young was not concerned about stealing K.S.' car or her money. Rather, as apparent in the court's statement above, it focused on Young attacking K.S. and Young's attempt to "drag her into the back seat of the car" and that this was an "extremely dangerous and . . . violent" crime.

Young also contends that the district court's erroneous comments "clearly established that the sentence imposed was harsher because of an unsubstantiated belief that [Young] intended to commit a sexual assault rather than a theft." Brief for appellant at 19. There is nothing in the court's

comments at sentencing to support this assertion. Rather, the court focused on the fact that Young followed the victim into a parking garage at 2 a.m., "attacked her," and tried to drag her into her car. There is no mention of what Young may have intended to do. Rather, these actions alone support the court's characterization of the offense as "extremely dangerous" and "violent." Young's claim is not supported by the record.

## 2. VICTIM IMPACT STATEMENTS

Young argues that K.S. and her family "submitted multiple letters to the presentence report which were not limited to showing the personal characteristics of the victim or the emotional impact the crimes had on her family." Brief for appellant at 29. He claims the letters "made repeated characterizations and opinions about the crimes," as well as "repeated statements about the length of sentence which should be imposed." *Id*. He directs us to statements such as: "'If he doesn't get the full time in jail and gets out and attacks someone I will feel responsible'" and "'I believe that if he doesn't get the max sentence he will attack someone else and they might not be able to get away.'" *Id*. Young asserts that the court "never claimed on the record that she disregarded the inappropriate sentencing arguments." *Id*. at 30. Young contends that the fact that the court "imposed the maximum, consecutive prison sentences, as requested by the prosecutor and the numerous improper victim impact statements, supports a very strong inference that the sentences imposed by the sentencing judge were influenced by the improper sentencing arguments made by the victim and her family." *Id*. We disagree. The record does not support that the district court relied upon anything improper or inappropriate contained in the victim impact statements.

Neb. Rev. Stat. § 29-2261(3) (Supp. 2023) states that a "presentence investigation and report shall include, when available, an analysis of the circumstances attending the commission of the crime, the offender's history of delinquency or criminality, physical and mental condition, family situation and background, economic status, education, occupation, and personal habits, and any other matters that the probation officer deems relevant or the court directs to be included." The investigation shall also include any written statements by a victim submitted to the county attorney or to probation. See *id*. A sentencing court has discretion to allow comments at sentencing from those directly impacted by a defendant's crime, even over a defendant's objection that the commenter is not a victim as defined by statute. See *State v. Lara*, 315 Neb. 856, 2 N.W.3d 1 (2024).

Absent an abuse of discretion, an appellate court will not disturb a trial court's rulings as to the source and type of evidence and information that may be used in determining the kind and extent of punishment to be imposed. *State v. Gleaton*, 316 Neb. 114, 3 N.W.3d 334 (2024). In *Gleaton*, the defendant sought to exclude from the PSR any victim impact letters from anyone other than victims as defined by statute, as well as any letters that included characterizations and opinions about the crimes and appropriate sentences. The Nebraska Supreme Court observed that it had "on numerous occasions, rejected arguments that the Nebraska Crime Victim's Reparations Act prohibits a sentencing court from receiving information from individuals other than those specifically identified as victims in that statute." *Id*. at 138, 3 N.W.3d at 351. Further, while it acknowledged that in some capital cases such characterizations and opinions about the crime, the defendant, and the appropriate sentence may not be received in evidence, it declined to apply it in a noncapital case, and also observed that in that case, the district court expressly stated it would

not consider such information. See *id*. Further, even in a capital case, the Eighth Amendment is not violated if a sentencing panel does not consider impermissible victim impact statements. *Id*. And while a jury will be assumed to have considered such impermissible statements, the presumption for judges is the opposite. *State v. Bjorklund*, 258 Neb. 432, 604 N.W.2d 169 (2000) (although sentencing judge did not explicitly state it did not consider statements by victim's family, there was no evidence that sentencing judge considered them), *abrogated on other grounds, State v. Mata*, 275 Neb. 1, 745 N.W.2d 229 (2008). In the absence of evidence to the contrary, the presumption is that a judge will disregard evidence that should not have been admitted. *Id*.

Young argues that the "record fails to establish that the sentencing judge disregarded the improper sentencing comments of the victim and her family" and that trial counsel failed to object to "said improper sentencing statements." Brief for appellant at 29-30. However, regardless of any failure to object by defense counsel, and regardless of a sentencing judge not explicitly stating it did not consider certain statements, it is presumed that a judge will disregard evidence that should not have been admitted. See *State v. Bjorklund, supra*. The canon that in a case tried to the court without a jury there is a presumption that the trial court, in reaching its decision, only considered evidence that is competent and relevant, has equal application to a sentencing court's consideration of a presentence report. *State v. Tyrrell*, 234 Neb. 901, 453 N.W.2d 104 (1990). Thus, on appeal from a criminal sentence, it is presumed that in considering a presentence report the sentencing judge considered only material which is relevant and competent. *Id*. Given that presumption and seeing no statement by the district court to suggest otherwise, Young's claimed error as to the victim impact statements is not supported by the record.

### 3. PROSECUTORIAL MISCONDUCT

Prosecutorial misconduct encompasses conduct that violates legal or ethical standards for various contexts because the conduct will or may undermine a defendant's right to a fair trial. *State v. Mrza*, 302 Neb. 931, 926 N.W.2d 79 (2019). Prosecutors are charged with the duty to conduct criminal trials in such a manner that the accused may have a fair and impartial trial, and prosecutors are not to inflame the prejudices or excite the passions of the jury against the accused. *Id*. A prosecutor's conduct that does not mislead and unduly influence the jury does not constitute misconduct. *Id*.

In assessing allegations of prosecutorial misconduct based on prosecutorial remarks, a court first determines whether the prosecutor's remarks were improper. *State v. Cooke*, 311 Neb. 511, 973 N.W.2d 658 (2022) (alleged prosecutorial misconduct based on remarks at sentencing did not amount to plain error). Next, a reviewing court must determine the extent to which the improper remarks had a prejudicial effect on the defendant's right to a fair trial. *Id*.

The failure to timely assert an objection on the basis of alleged prosecutorial misconduct amounts to a forfeiture of the right to appellate review of the issue, but an appellate court still has the discretion to notice plain error. See *State v. Gleaton*, 316 Neb. 114, 3 N.W.3d 334 (2024).

### (a) Alleged Improper Sentencing Factors

In the present case, the prosecutor wrote a letter to the district court requesting maximum sentences for Young because failing to do so would "'send a message that Nebraska courts do not take the safety of its female citizens seriously and would encourage its citizens to do the same.'"

Brief for appellant at 25. The prosecutor made the same statement orally at sentencing. Young contends that these statements were "inflammatory, improper, irrelevant, and highly prejudicial." *Id*. at 26. He claims that the fact that the court "imposed three maximum, consecutive prison sentences, as requested by the prosecutor, supports a very strong inference that the sentences imposed by the sentencing judge were influenced by the improper sentencing arguments of the prosecutor." *Id*. "The record simply does not eliminate the likelihood that the prosecutorially induced pressure of the sentencing judge potentially disappointing an entire female gender population and being responsible for how others perceive the entire State of Nebraska's judicial system, impacted the ultimate sentences which were imposed in this matter." *Id*.

However, as pointed out by the State, the prosecutor's argument that failing to order the maximum sentences in this case would send a message that Nebraska courts do not take the safety of its female citizens seriously was simply a "remark based on the concept of general deterrence." Brief for appellee at 16. A prosecutor is entitled to draw inferences from the evidence in presenting his or her case, and such inferences generally do not amount to prosecutorial misconduct. *State v. Munoz*, 303 Neb. 69, 927 N.W.2d 25 (2019).

In response, Young argues that the "prosecutor's comments in the present case fell well outside the limits of general deterrence." Reply brief for appellant at 5. "Rather, the prosecutor blatantly requested that the sentencing court consider improper, irrelevant, and inflammatory factors such as how the trial judge's sentences will be perceived by an entire gender population . . . and sending a message as to how others will perceive . . . Nebraska's judicial system based upon the sentences this particular judge will impose against this particular defendant." *Id*.

Once again, the record does not reflect that the district court gave any consideration to or was persuaded by the prosecutor's remarks. Rather, as discussed previously, the court focused on the fact that Young followed the victim "at 2 a.m.," "attacked her," and "tried to drag her in to the back seat of the car." It found this to be an "extremely dangerous crime and a violent one." And as previously noted, there is a presumption that the sentencing court only considered evidence that was competent and relevant. See *State v. Tyrrell, supra*. Young's claim to the contrary is not supported by the record.

(b) Prosecutor's Sexual Assault Remarks

Young contends that the prosecutor argued at the sentencing hearing that Young "deliberately attempted to sexually assault the victim." Brief for appellant at 27. It is true that the prosecutor made that argument. After discrediting the numerous character letters written in support of Young because they failed to mention the specific facts of the case or failed to mention the victim, the prosecutor then challenged Young's version of the events on November 19, 2022. The prosecutor argued that K.S.' story was more credible than Young's story; that K.S. was more credible. K.S. was sober and "didn't embellish." "She didn't try to infer certain things that didn't occur about what Mr. Young was trying to do, whether he was trying to do anything sexually with her. She was honest about what she remembered and she can remember things better than Mr. Young, who was clearly intoxicated at the time." The prosecutor subsequently stated:

> The State would submit that the evidence proves that [K.S.] fought back against . . . Young's deliberate attempt to kidnap and sexually assault her. This Court has seen many people convicted of very serious sexual assault offenses, and a lot of times sexually deviant

people go without detection for years and they come before the Court on a 1B felony having no criminal history whatsoever. So that's not entirely surprising to any of the parties here. This could have been the beginning act and something that [K.S.] was strong enough, luckily, to fight back.

The State responds again that these remarks were "based on the prosecutor's interpretation of the evidence, which was reasonable given the circumstances." Brief for appellee at 16. The State also points out that the district court "never identified sexual assault as the motive." *Id*. "But more importantly, the district court was perfectly capable of drawing its own conclusions regarding Young's intent, or lack thereof, based on its independent review of the record." *Id*.

Young responds that the "prosecutor's alleged interpretation of the evidence was entirely unreasonable and completely unsupported by the record." Reply brief for appellant at 5. He contends the record is "legally insufficient to suggest that a sexual assault or attempted sexual assault occurred." *Id*. at 6. Young points out that during the victim's deposition, she testified that Young "never tried to kiss her, never tried to fondle her breasts, never tried to fondle her 'backside,' never tried to fondle her genitals, or any other part of her body." *Id*. Nor did Young ever say anything to the victim "which would be considered sexual in nature." *Id*. He further refers to the plea hearing during which time the prosecutor agreed that the elements of sexual contact and sexual penetration were not present in this case. "Therefore, any suggestion that [Young] intended to sexually assault the victim was purely speculative and utterly unsupported by the record," and "it was inappropriate for the prosecutor to argue that [Young's] attempted sexual assault of the victim should be considered by the court at sentencing." *Id*.

We agree with Young that the prosecutor's comments were speculative. But even if they were inappropriate and rose to the level of misconduct, the record does not support any prejudice resulting from the prosecutor's statements. There is nothing in the district court's comments at sentencing to indicate that it viewed this offense as being sexual in nature. The court was focused on the crime being "extremely dangerous" and "violent," which was supported by the record. And, as Young himself points out, it was specifically announced by the State at the plea hearing that "after taking the deposition of the victim . . . there is an agreement that the elements of sexual contact and sexual penetration are not present in this offense, and therefore registration does not apply." Once again, there is a presumption that the sentencing court, in reaching its decision, only considered evidence that is competent and relevant. See *State v. Tyrrell, supra*.

### 4. INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL

Whether a claim of ineffective assistance of trial counsel may be determined on direct appeal is a question of law. *State v. Blaha*, 303 Neb. 415, 929 N.W.2d 494 (2019). In reviewing claims of ineffective assistance of counsel on direct appeal, an appellate court decides only whether the undisputed facts contained within the record are sufficient to conclusively determine whether counsel did or did not provide effective assistance and whether the defendant was or was not prejudiced by counsel's alleged deficient performance. *Id*.

When a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must raise on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the record. *State v. Lierman*, 305 Neb. 289, 940 N.W.2d

529 (2020). Young's appellate counsel is different from his trial counsel. Once raised, the appellate court will determine whether the record on appeal is sufficient to review the merits of the ineffective performance claims. *Id.* A record is sufficient if it establishes either that trial counsel's performance was not deficient, that the appellant will not be able to establish prejudice, or that trial counsel's actions could not be justified as a part of any plausible trial strategy. *State v. Theisen*, 306 Neb. 591, 946 N.W.2d 677 (2020).

To show that counsel's performance was deficient, a defendant must show that counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law. *State v. Blaha*, 303 Neb. 415, 929 N.W.2d 494 (2019). In a plea context, deficiency depends on whether counsel's advice was within the range of competence demanded of attorneys in criminal cases. *Id.* When a conviction is based upon a guilty or no contest plea, the prejudice requirement for an ineffective assistance of counsel claim is satisfied if the defendant shows a reasonable probability that but for the errors of counsel, the defendant would have insisted on going to trial rather than pleading guilty. *Id*.

As to each of the assigned errors discussed above, Young contends that his trial counsel was ineffective by failing to make objections during the sentencing hearing in each instance. However, because we have determined that in each instance there was no error, any objection by trial counsel would have failed or would have had no bearing on the outcome. As a matter of law, counsel cannot be ineffective for failing to raise a meritless argument. *State v. Schwaderer*, 296 Neb. 932, 898 N.W.2d 318 (2017). Further, even if trial counsel was deficient for not objecting, Young would not be able to establish any prejudice in sentencing based on this record.

### 5. EXCESSIVE SENTENCE

Young argues that "there is simply no justification for imposing upon [him] three maximum prison sentences rather than probationary sentences or lesser periods of incarceration." Brief for appellant at 23. He claims that "[r]ather than properly balancing the seriousness of the present offenses with the history, character, and condition of [Young], the lower court inappropriately focused entirely on the seriousness of the present offenses (even though the present offenses involved two lower-level felonies and one misdemeanor)." *Id*. at 23-24.

A sentence imposed within the statutory limits will not be disturbed on appeal absent an abuse of discretion by the trial court. *State v. Miller*, 315 Neb. 951, 2 N.W.3d 345 (2024).

Young was convicted of false imprisonment in the first degree pursuant to Neb. Rev. Stat. § 28-314 (Reissue 2016), a Class IIIA felony; and terroristic threats pursuant to Neb. Rev. Stat. § 28-311.01 (Reissue 2016), also a Class IIIA felony. A Class IIIA felony has no minimum sentence and a maximum sentence of 3 years' imprisonment or a $10,000 fine, or both, plus 9 to 18 months' post-release supervision if a sentence is imposed. See Neb. Rev. Stat. § 28-105(1) (Cum. Supp. 2022). Young was sentenced to "36 months" of imprisonment on each of his Class IIIA felonies, along with "18 months" of post-release supervision on each felony count. Young was also convicted of third degree assault pursuant to § 28-310(1) (Reissue 2016), a Class I misdemeanor. A Class I misdemeanor has no minimum sentence and a maximum sentence of no more than 1 year of imprisonment or a $1,000 fine, or both. See Neb. Rev. Stat. § 28-106(1) (Reissue 2016). Young was sentenced to "12 months" on his misdemeanor conviction. All of Young's sentences were ordered to be served consecutively, except that his post-release

supervision was to run concurrently. Young's sentences were within the statutory sentencing range. We therefore review his sentences for an abuse of discretion. See *State v. Miller, supra*.

When imposing a sentence, a sentencing judge should consider the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense, and (8) the amount of violence involved in the commission of the crime. *State v. Lierman*, 305 Neb. 289, 940 N.W.2d 529 (2020). The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life. *Id*. Generally, it is within a trial court's discretion to direct that sentences imposed for separate crimes be served either concurrently or consecutively. *State v. Ezell*, 314 Neb. 825, 993 N.W.2d 449 (2023). For a defendant who has been sentenced consecutively for two or more crimes, we generally consider the aggregate sentence to determine if it is excessive. *Id*.

Upon our review of the relevant sentencing factors in this case, it is evident that the court appropriately considered the seriousness of Young's offenses and his individual circumstances. Because the appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life, a sentencing court is accorded very wide discretion in imposing a sentence. See *State v. Rogers*, 297 Neb. 265, 899 N.W.2d 626 (2017).

To the extent Young argues that the district court did not adequately consider certain mitigating factors, it is evident the court had before it all the information Young suggests should have resulted in a lesser sentence. To the extent he claims the court gave too much consideration to certain sentencing factors and not others, we note that it was within the sentencing court's discretion to weigh more heavily the factors supporting a lengthier sentence, such as the seriousness of the offenses and the lasting effects on the victim. We have already addressed Young's claim that the court relied upon or was persuaded by improper or inappropriate sentencing factors. The record does not support that assertion, particularly given the presumption afforded to the sentencing court that it only considered evidence that was competent and relevant in reaching its decision. See *State v. Tyrrell*, 234 Neb. 901, 453 N.W.2d 104 (1990). We find no abuse of discretion by the trial court in the sentences imposed.

## VI. CONCLUSION

We affirm the district court's sentencing order. We also conclude that all of Young's claims of ineffective assistance of trial counsel fail.

AFFIRMED.